# WONG SUN ET AL. v. UNITED STATES.

No. 36.   Argued March 29 and April 2, 1962.—Restored to calendar for reargument June 4, 1962.—Reargued October 8, 1962.— Decided January 14, 1963.

*Edward Bennett Williams,* acting under appointment by the Court, 368 U. S. 973, reargued the cause and filed a supplemental brief for petitioners. *Sol A. Abrams* also filed a brief for petitioners.

*J. William Doolittle* reargued the cause for the United States. On the brief were *Solicitor General Cox, Assistant Attorney General Miller, Beatrice Rosenberg* and *J. F. Bishop.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The petitioners were tried without a jury in the District Court for the Northern District of California under a two-count indictment for violation of the Federal Narcotics

Laws, 21 U. S. C. § 174.[1]  They were acquitted under the first count which charged a conspiracy, but convicted under the second count which charged the substantive offense of fraudulent and knowing transportation and concealment of illegally imported heroin.  The Court of Appeals for the Ninth Circuit, one judge dissenting, affirmed the convictions.  288 F. 2d 366.  We granted certiorari.  368 U. S. 817.  We heard argument in the 1961 Term and reargument this Term.  370 U. S. 908.

About 2 a. m. on the morning of June 4, 1959, federal narcotics agents in San Francisco, after having had one Hom Way under surveillance for six weeks, arrested him and found heroin in his possession.  Hom Way, who had not before been an informant, stated after his arrest that he had bought an ounce of heroin the night before from one known to him only as "Blackie Toy," proprietor of a laundry on Leavenworth Street.

About 6 a. m. that morning six or seven federal agents went to a laundry at 1733 Leavenworth Street.  The sign

---

[1] 21 U. S. C. § 174:

"Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000.  For a second or subsequent offense (as determined under section 7237 (c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000.

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

above the door of this establishment said "Oye's Laundry." It was operated by the petitioner James Wah Toy. There is, however, nothing in the record which identifies James Wah Toy and "Blackie Toy" as the same person. The other federal officers remained nearby out of sight while Agent Alton Wong, who was of Chinese ancestry, rang the bell. When petitioner Toy appeared and opened the door, Agent Wong told him that he was calling for laundry and dry cleaning. Toy replied that he didn't open until 8 o'clock and told the agent to come back at that time. Toy started to close the door. Agent Wong thereupon took his badge from his pocket and said, "I am a federal narcotics agent." Toy immediately "slammed the door and started running" down the hallway through the laundry to his living quarters at the back where his wife and child were sleeping in a bedroom. Agent Wong and the other federal officers broke open the door and followed Toy down the hallway to the living quarters and into the bedroom. Toy reached into a nightstand drawer. Agent Wong thereupon drew his pistol, pulled Toy's hand out of the drawer, placed him under arrest and handcuffed him. There was nothing in the drawer and a search of the premises uncovered no narcotics.

One of the agents said to Toy ". . . [Hom Way] says he got narcotics from you." Toy responded, "No, I haven't been selling any narcotics at all. However, I do know somebody who has." When asked who that was, Toy said, "I only know him as Johnny. I don't know his last name." However, Toy described a house on Eleventh Avenue where he said Johnny lived; he also described a bedroom in the house where he said "Johnny kept about a piece" [2] of heroin, and where he and Johnny had smoked some of the drug the night before. The agents

---

[2] A "piece" is approximately one ounce.

left immediately for Eleventh Avenue and located the house. They entered and found one Johnny Yee in the bedroom. After a discussion with the agents, Yee took from a bureau drawer several tubes containing in all just less than one ounce of heroin, and surrendered them. Within the hour Yee and Toy were taken to the Office of the Bureau of Narcotics. Yee there stated that the heroin had been brought to him some four days earlier by petitioner Toy and another Chinese known to him only as "Sea Dog."

Toy was questioned as to the identity of "Sea Dog" and said that "Sea Dog" was Wong Sun. Some agents, including Agent Alton Wong, took Toy to Wong Sun's neighborhood where Toy pointed out a multifamily dwelling where he said Wong Sun lived. Agent Wong rang a downstairs door bell and a buzzer sounded, opening the door. The officer identified himself as a narcotics agent to a woman on the landing and asked "for Mr. Wong." The woman was the wife of petitioner Wong Sun. She said that Wong Sun was "in the back room sleeping." Alton Wong and some six other officers climbed the stairs and entered the apartment. One of the officers went into the back room and brought petitioner Wong Sun from the bedroom in handcuffs. A thorough search of the apartment followed, but no narcotics were discovered.

Petitioner Toy and Johnny Yee were arraigned before a United States Commissioner on June 4 on a complaint charging a violation of 21 U. S. C. § 174. Later that day, each was released on his own recognizance. Petitioner Wong Sun was arraigned on a similar complaint filed the next day and was also released on his own recognizance.[3]

---

[3] The Record of the arraignment proceedings recites that arrest warrants were issued, on the arraignment dates, for the arrest of both petitioners and Yee. It was conceded in the trial court, however,

Within a few days, both petitioners and Yee were interrogated at the office of the Narcotics Bureau by Agent William Wong, also of Chinese ancestry.[4]  The agent advised each of the three of his right to withhold information which might be used against him, and stated to each that he was entitled to the advice of counsel, though it does not appear that any attorney was present during the questioning of any of the three.  The officer also explained to each that no promises or offers of immunity or leniency were being or could be made.

The agent interrogated each of the three separately. After each had been interrogated the agent prepared a statement in English from rough notes.  The agent read petitioner Toy's statement to him in English and interpreted certain portions of it for him in Chinese.  Toy also read the statement in English aloud to the agent, said there were corrections to be made, and made the corrections in his own hand.  Toy would not sign the statement, however; in the agent's words "he wanted to know first if the other persons involved in the case had signed theirs." Wong Sun had considerable difficulty understanding the

that no arrest warrants were outstanding at the time of the actual arrests on June 4.

The Record also states that bond was initially fixed for each of the petitioners and for Yee in the amount of $5,000, on the recommendation of the United States Attorney.  Later on the respective arraignment days, again on motion of the United States Attorney, it was ordered that each of the three be released on his own recognizance.

[4] Because neither statement was ever signed, the blanks in which the dates were to have been inserted were never filled in.  The heading of Toy's statement suggests that it was made on June 5, although Agent William Wong at the trial suggested he had only talked informally with Toy on that date, the formal statement not being made until June 9.  The agent also testified that Wong Sun's statement was made June 9, although a rubber-stamp date beneath the agent's own signature at the foot of the statement reads, "June 15, 1959."

statement in English and the agent restated its substance in Chinese. Wong Sun refused to sign the statement although he admitted the accuracy of its contents.[5]

Hom Way did not testify at petitioners' trial. The Government offered Johnny Yee as its principal witness but excused him after he invoked the privilege against self-incrimination and flatly repudiated the statement he had given to Agent William Wong. That statement was not offered in evidence nor was any testimony elicited from him identifying either petitioner as the source of the heroin in his possession, or otherwise tending to support the charges against the petitioners.

The statute expressly provides that proof of the accused's possession of the drug will support a conviction under the statute unless the accused satisfactorily explains the possession. The Government's evidence tending to prove the petitioners' possession (the petitioners offered no exculpatory testimony) consisted of four items which the trial court admitted over timely objections that they were inadmissible as "fruits" of unlawful arrests or of attendant searches: (1) the statements made orally by petitioner Toy in his bedroom at the time of his arrest; (2) the heroin surrendered to the agents by Johnny Yee; (3) petitioner Toy's pretrial unsigned statement; and (4) petitioner Wong Sun's similar statement. The dispute below and here has centered around the correctness of the rulings of the trial judge allowing these items in evidence.

The Court of Appeals held that the arrests of both petitioners were illegal because not based on " 'probable cause' within the meaning of the Fourth Amendment" nor "reasonable grounds" within the meaning of the Narcotic

---

[5] The full texts of both statements are set forth in an Appendix to this opinion.

Control Act of 1956.[6]  The court said as to Toy's arrest, "There is no showing in this case that the agent knew Hom Way to be reliable," and, furthermore, found "nothing in the circumstances occurring at Toy's premises that would provide sufficient justification for his arrest without a warrant."  288 F. 2d, at 369, 370.  As to Wong Sun's arrest, the Court said "there is no showing that Johnnie Yee was a reliable informer."  The Court of Appeals nevertheless held that the four items of proof were not the "fruits" of the illegal arrests and that they were therefore properly admitted in evidence.

The Court of Appeals rejected two additional contentions of the petitioners.  The first was that there was insufficient evidence to corroborate the petitioners' unsigned admissions of possession of narcotics.  The court held that the narcotics in evidence surrendered by Johnny Yee, together with Toy's statements in his bedroom at the time of arrest corroborated petitioners' admissions. The second contention was that the confessions were

---

[6] 26 U. S. C. § 7607:

"The Commissioner, Deputy Commissioner, Assistant to the Commissioner, and agents, of the Bureau of Narcotics of the Department of the Treasury, and officers of the customs (as defined in section 401 (1) of the Tariff Act of 1930, as amended; 19 U. S. C., sec. 1401 (1)), may—

"(1) carry firearms, execute and serve search warrants and arrest warrants, and serve subpenas and summonses issued under the authority of the United States, and

"(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731) or marihuana (as defined in section 4761) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

The terms "probable cause" for purposes of the Fourth Amendment and "reasonable grounds" as used in the statute, mean substantially the same.  *Draper* v. *United States*, 358 U. S. 307, 310, n. 3; *United States* v. *Walker*, 246 F. 2d 519, 526.

inadmissible because they were not signed. The Court of Appeals held on this point that the petitioners were not prejudiced, since the agent might properly have testified to the substance of the conversations which produced the statements.

We believe that significant differences between the cases of the two petitioners require separate discussion of each. We shall first consider the case of petitioner Toy.

## I.

The Court of Appeals found there was neither reasonable grounds nor probable cause for Toy's arrest. Giving due weight to that finding, we think it is amply justified by the facts clearly shown on this record. It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion, see *Henry* v. *United States*, 361 U. S. 98, 101, though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause—evidence which would "warrant a man of reasonable caution in the belief" that a felony has been committed, *Carroll* v. *United States*, 267 U. S. 132, 162—must be measured by the facts of the particular case. The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would "leave law-abiding citizens at the mercy of the officers' whim or caprice." [7] *Brinegar* v. *United States*, 338 U. S. 160, 176.

Whether or not the requirements of reliability and particularity of the information on which an officer may act are more stringent where an arrest warrant is absent, they surely cannot be less stringent than where an arrest warrant is obtained. Otherwise, a principal incentive now

[7] See *Giordenello* v. *United States*, 357 U. S. 480, 485–487; *Johnson* v. *United States*, 333 U. S. 10, 16–17. See generally Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 673, 695–701 (1924).

existing for the procurement of arrest warrants would be destroyed.[8] The threshold question in this case, therefore, is whether the officers could, on the information which impelled them to act, have procured a warrant for the arrest of Toy. We think that no warrant would have issued on evidence then available.

The narcotics agents had no basis in experience for confidence in the reliability of Hom Way's information; he had never before given information. And yet they acted upon his imprecise suggestion that a person described only as "Blackie Toy," the proprietor of a laundry somewhere on Leavenworth Street, had sold one ounce of heroin. We have held that identification of the suspect by a reliable informant may constitute probable cause for arrest where the information given is sufficiently accurate to lead the officers directly to the suspect. *Draper* v. *United States,* 358 U. S. 307. That rule does not, however, fit this case. For aught that the record discloses, Hom Way's accusation merely invited the officers to roam the length of Leavenworth Street (some 30 blocks) in search of one "Blackie Toy's" laundry—and whether by chance or other

---

[8] Our discussion implies no view whether a search warrant should be obtained where a search is conducted incident to a valid arrest, cf. *United States* v. *Rabinowitz,* 339 U. S. 56, for nothing in this case turns on the presence or absence of a search warrant. Since the officers had obtained an arrest warrant in *Rabinowitz,* the question before us here was not there presented. As to the question before us, see *Wrightson* v. *United States,* 222 F. 2d 556, 559–560:

"But, if officers can arrest without a warrant and never be required to disclose the facts upon which they based their belief of probable cause—if, in other words, they have an untouchable power to arrest without a warrant,—why would they ever bother to get a warrant? And the same obvious conclusion follows if the courts, when an arrest is attacked as illegal, will assume, without facts, that an arrest without a warrant was for probable cause. To strike down all factual requirements in respect to probable cause for arrests without a warrant, while maintaining them for the issuance of a warrant, would be to blast one of the support columns of justice by law."

means (the record does not say) they came upon petitioner Toy's laundry, which bore not his name over the door, but the unrevealing label "Oye's." Not the slightest intimation appears on the record, or was made on oral argument, to suggest that the agents had information giving them reason to equate "Blackie" Toy and James Wah Toy—*e. g.*, that they had the criminal record of a Toy, or that they had consulted some other kind of official record or list, or had some information of some kind which had narrowed the scope of their search to this particular Toy.

It is conceded that the officers made no attempt to obtain a warrant for Toy's arrest. The simple fact is that on the sparse information at the officers' command, no arrest warrant could have issued consistently with Rules 3 and 4 of the Federal Rules of Criminal Procedure. *Giordenello* v. *United States,* 357 U. S. 480, 486.[9] The arrest warrant procedure serves to insure that the deliberate, impartial judgment of a judicial officer will be inter-

---

[9] We noted in *Giordenello* that Rules 3 and 4 of the Federal Rules of Criminal Procedure provide that an arrest warrant shall issue only upon a sworn complaint setting forth "the essential facts constituting the offense charged," and showing "that there is probable cause to believe that an offense has been committed and that the defendant has committed it . . . ." The Fourth Amendment, from which the requirements of the Rules derive, provides that ". . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* . . . the persons or things to be seized." (Emphasis added.) The requirement applies both to arrest and search warrants. A description of a suspect merely as "Blackie Toy," operator of a laundry somewhere on Leavenworth Street, hardly is information "particularly describing . . . the person . . . to be seized." Such information is no better than the wholesale or "dragnet" search warrant, which we have condemned. See, *e. g., Marron* v. *United States,* 275 U. S. 192, 196; see generally Kaplan, Search and Seizure: A No-Man's Land in the Criminal Law, 49 Calif. L. Rev. 474, 480–482 (1961).

posed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause. Cf. *Jones* v. *United States,* 362 U. S. 257, 270. To hold that an officer may act in his own, unchecked discretion upon information too vague and from too untested a source to permit a judicial officer to accept it as probable cause for an arrest warrant, would subvert this fundamental policy.

The Government contends, however, that any defects in the information which somehow took the officers to petitioner Toy's laundry were remedied by events which occurred after they arrived. Specifically, it is urged that Toy's flight down the hall when the supposed customer at the door revealed that he was a narcotics agent adequately corroborates the suspicion generated by Hom Way's accusation. Our holding in *Miller* v. *United States,* 357 U. S. 301, is relevant here, and exposes the fallacy of this contention. We noted in that case that the lawfulness of an officer's entry to arrest without a warrant "must be tested by criteria identical with those embodied in 18 U. S. C. § 3109, which deals with entry to execute a search warrant." 357 U. S., at 306. That statute requires that an officer must state his authority and his purpose at the threshold, and be refused admittance, before he may break open the door. We held that when an officer insufficiently or unclearly identifies his office or his mission, the occupant's flight from the door must be regarded as ambiguous conduct. We expressly reserved the question "whether the unqualified requirements of the rule admit of an exception justifying noncompliance in exigent circumstances." 357 U. S., at 309. In the instant case, Toy's flight from the door afforded no surer an inference of guilty knowledge than did the suspect's conduct in the *Miller* case. Agent Wong did eventually disclose that he was a narcotics officer. However, he affirmatively misrepresented his mission at the

outset, by stating that he had come for laundry and dry cleaning. And before Toy fled, the officer never adequately dispelled the misimpression engendered by his own ruse. Cf. *Gouled* v. *United States,* 255 U. S. 298; *Gatewood* v. *United States,* 209 F. 2d 789.

Moreover, he made no effort at that time, nor indeed at any time thereafter, to ascertain whether the man at the door was the "Blackie Toy" named by Hom Way. Therefore, this is not the case we hypothesized in *Miller* where "without an express announcement of purpose, the facts known to officers would justify them in being virtually certain" that the person at the door knows their purpose. 357 U. S., at 310. Toy's refusal to admit the officers and his flight down the hallway thus signified a guilty knowledge no more clearly than it did a natural desire to repel an apparently unauthorized intrusion.[10] Here, as in *Miller,*

---

[10] Although the question presented here is only whether the petitioner's flight justified an inference of guilt sufficient to generate probable cause for his arrest, and not whether his flight would serve to corroborate proof of his guilt at trial, the two questions are inescapably related. Thus it is relevant to the present case that we have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime. In *Alberty* v. *United States,* 162 U. S. 499, 511, this Court said:

". . . it is not universally true that a man, who is conscious that he has done a wrong, 'will pursue a certain course not in harmony with the conduct of a man who is conscious of having done an act which is innocent, right and proper;' since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.'"

See also *Hickory* v. *United States,* 160 U. S. 408; *Allen* v. *United States,* 164 U. S. 492; *Starr* v. *United States,* 164 U. S. 627; and for the views of two Courts of Appeals see *Vick* v. *United States,* 216 F. 2d 228, 233 (C. A. 5th Cir.) ("One motive is about as likely as another. Appellant may be guilty, but his conviction cannot rest upon mere conjecture and suspicion"); cf. *Cooper* v. *United States,*

the Government claims no extraordinary circumstances—such as the imminent destruction of vital evidence, or the need to rescue a victim in peril—see 357 U. S., at 309—which excused the officer's failure truthfully to state his mission before he broke in.

A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked. Cf. *Henry* v. *United States,* 361 U. S. 98, 104. That result would have the same essential vice as a proposition we have consistently rejected—that a search unlawful at its inception may be validated by what it turns up. *Byars* v. *United States,* 273 U. S. 28; *United States* v. *Di Re,* 332 U. S. 581, 595. Thus we conclude that the Court of Appeals' finding that the officers' uninvited entry into Toy's living quarters was unlawful and that the bedroom arrest which followed was likewise unlawful, was fully justified on the evidence. It remains to be seen what consequences flow from this conclusion.

## II.

It is conceded that Toy's declarations in his bedroom are to be excluded if they are held to be "fruits" of the agents' unlawful action.

In order to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person, *Boyd* v. *United States,* 116 U. S. 616, this Court held nearly half a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search. *Weeks* v. *United States,* 232 U. S. 383. The exclusionary prohibition extends as well to the indirect as the direct products of such invasions. *Silverthorne Lumber Co.* v. *United States,* 251

218 F. 2d 39, 41 (C. A. D. C. Cir.) ("After all, innocent people caught in a web of circumstances frequently become terror-stricken"). But cf. *United States* v. *Heitner,* 149 F. 2d 105 (C. A. 2d Cir.).

U. S. 385. Mr. Justice Holmes, speaking for the Court in that case, in holding that the Government might not make use of information obtained during an unlawful search to subpoena from the victims the very documents illegally viewed, expressed succinctly the policy of the broad exclusionary rule:

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." 251 U. S., at 392.

The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman* v. *United States,* 365 U. S. 505, that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of "papers and effects." Similarly, testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies. *McGinnis* v. *United States,* 227 F. 2d 598. Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion.[11] See

---

[11] See Kamisar, Illegal Searches or Seizures and Contemporaneous Incriminating Statements: A Dialogue on a Neglected Area of Criminal Procedure, 1961 U. of Ill. Law Forum 78, 84–96. But compare Maguire, Evidence of Guilt (1959), 187–190.

*Nueslein* v. *District of Columbia,* 115 F. 2d 690. Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. Either in terms of deterring lawless conduct by federal officers, *Rea* v. *United States,* 350 U. S. 214, or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, *Elkins* v. *United States,* 364 U. S. 206, the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction.

The Government argues that Toy's statements to the officers in his bedroom, although closely consequent upon the invasion which we hold unlawful, were nevertheless admissible because they resulted from "an intervening independent act of a free will." This contention, however, takes insufficient account of the circumstances. Six or seven officers had broken the door and followed on Toy's heels into the bedroom where his wife and child were sleeping. He had been almost immediately hand-cuffed and arrested. Under such circumstances it is unreasonable to infer that Toy's response was sufficiently an act of free will to purge the primary taint of the unlawful invasion.[12]

---

[12] See Lord Devlin's comment: "It is probable that even today, when there is much less ignorance about these matters than formerly, there is still a general belief that you must answer all questions put to you by a policeman, or at least that it will be the worse for you if you do not." Devlin, The Criminal Prosecution in England (1958), 32. Even in the absence of such oppressive circumstances, and where an exclusionary rule rests principally on nonconstitutional grounds, we have sometimes refused to differentiate between voluntary and involuntary declarations. See Hogan and Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo. L. J. 1, 26–27 (1958). For illustrative situations where a voluntary act of the accused has been held insufficient to cure the otherwise unlawful acquisition of evidence, see *Bynum* v. *United States,* 262 F. 2d 465 (holding inadmissible fingerprints made by defendant after unlawful

The Government also contends that Toy's declarations should be admissible because they were ostensibly exculpatory rather than incriminating. There are two answers to this argument. First, the statements soon turned out to be incriminating, for they led directly to the evidence which implicated Toy. Second, when circumstances are shown such as those which induced these declarations, it is immaterial whether the declarations be termed "exculpatory." [13] Thus we find no substantial reason to omit Toy's declarations from the protection of the exclusionary rule.

## III.

We now consider whether the exclusion of Toy's declarations requires also the exclusion of the narcotics taken from Yee, to which those declarations led the police. The prosecutor candidly told the trial court that "we wouldn't have found those drugs except that Mr. Toy helped us to." Hence this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence "from an independent source," *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385, 392; nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone* v. *United States*, 308 U. S. 338, 341. We need not hold that all evi-

---

arrest); *United States* v. *Watson*, 189 F. Supp. 776 (excluding narcotics voluntarily surrendered by accused in the course of an unauthorized search). The Ninth Circuit Court of Appeals from which the instant case comes has recognized in an analogous context, that "all declarations and statements under the compulsion of the things so seized, are affected by the vice of primary illegality. . . ." *Takahashi* v. *United States*, 143 F. 2d 118, 122.

[13] Moreover, we held in *Opper* v. *United States*, 348 U. S. 84, 92, that even where exculpatory statements are voluntary and thus clearly admissible, they require at least the degree of corroboration required of incriminating statements.

dence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959). We think it clear that the narcotics were "come at by the exploitation of that illegality" and hence that they may not be used against Toy.

## IV.

It remains only to consider Toy's unsigned statement. We need not decide whether, in light of the fact that Toy was free on his own recognizance when he made the statement, that statement was a fruit of the illegal arrest. Cf. *United States* v. *Bayer,* 331 U. S. 532. Since we have concluded that his declarations in the bedroom and the narcotics surrendered by Yee should not have been admitted in evidence against him, the only proofs remaining to sustain his conviction are his and Wong Sun's unsigned statements. Without scrutinizing the contents of Toy's ambiguous recitals, we conclude that no reference to Toy in Wong Sun's statement constitutes admissible evidence corroborating any admission by Toy. We arrive at this conclusion upon two clear lines of decisions which converge to require it. One line of our decisions establishes that criminal confessions and admissions of guilt require extrinsic corroboration; the other line of precedents holds that an out-of-court declaration made after arrest may not be used at trial against one of the declarant's partners in crime.

It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or

confession of the accused.[14]   We observed in *Smith* v. *United States*, 348 U. S. 147, 153, that the requirement of corroboration is rooted in "a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused."   In *Opper* v. *United States*, 348 U. S. 84, 89–90, we elaborated the reasons for the requirement:

> "In our country the doubt persists that the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession.   Admissions, retold at a trial, are much like hearsay, that is, statements not made at the pending trial.   They had neither the compulsion of the oath nor the test of cross-examination."

It is true that in *Smith* v. *United States,. supra,* we held that although "corroboration is necessary for all elements of the offense established by admissions alone," extrinsic proof was sufficient which "merely fortifies the truth of the confession, without independently establishing the crime charged . . . ."   348 U. S., at 156.[15]

---

[14] For the history and development of the corroboration requirement, see 7 Wigmore, Evidence (3d ed. 1940), §§ 2070–2071; Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 U. of Pa. L. Rev. 638–649 (1955).   For the present scope and application of the rule, see 2 Underhill, Criminal Evidence (5th ed. 1956), §§ 402–403.   For a comprehensive collection of cases, see Annot., 45 A. L. R. 2d 1316 (1956).

[15] Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable.   A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim.   See 7 Wigmore, Evidence (3d ed. 1940), § 2072, n. 5.   There need in such a case be no link,

However, Wong Sun's unsigned confession does not furnish competent corroborative evidence. The second governing principle, likewise well settled in our decisions, is that an out-of-court declaration made after arrest may not be used at trial against one of the declarant's partners in crime. While such a statement is "admissible against the others where it is in furtherance of the criminal undertaking . . . all such responsibility is at an end when the conspiracy ends." *Fiswick* v. *United States,* 329 U. S. 211, 217. We have consistently refused to broaden that very narrow exception to the traditional hearsay rule which admits statements of a codefendant made in furtherance of a conspiracy or joint undertaking.[16] See *Krulewitch* v. *United States,* 336 U. S. 440, 443–445. And where postconspiracy declarations have been admitted, we have carefully ascertained that limiting instructions kept the jury from considering the contents with respect to the guilt of anyone but the declarant. *Lutwak* v. *United States,* 344 U. S. 604, 618–619; *Delli Paoli* v. *United States,* 352 U. S. 232, 236–237. We have never ruled squarely on the question presented here, whether a codefendant's statement might serve to corroborate even where it will not suffice to convict.[17] We see

---

outside the confession, between the injury and the accused who admits having inflicted it. But where the crime involves no tangible *corpus delicti,* we have said that "the corroborative evidence must implicate the accused in order to show that a crime has been committed." 348 U. S., at 154. Finally, we have said that one uncorroborated admission by the accused does not, standing alone, corroborate an unverified confession. *United States* v. *Calderon,* 348 U. S. 160, 165.

[16] See Developments in the Law—Criminal Conspiracy, 72 Harv. L. Rev. 922, 989–990 (1959).

[17] Cf. Williams, The Proof of Guilt (1958), 135: "Even where . . . the evidence of an accomplice becomes admissible against his fellows, it remains suspect evidence, because of the tainted source from which it comes. The accomplice may no longer have anything to fear or

no warrant for a different result so long as the rule which regulates the use of out-of-court statements is one of admissibility, rather than simply of weight, of the evidence. The import of our previous holdings is that a co-conspirator's hearsay statements may be admitted against the accused for no purpose whatever, unless made during and in furtherance of the conspiracy. Thus as to Toy the only possible source of corroboration is removed and his conviction must be set aside for lack of competent evidence to support it.

## V.

We turn now to the case of the other petitioner, Wong Sun. We have no occasion to disagree with the finding of the Court of Appeals that his arrest, also, was without probable cause or reasonable grounds. At all events no evidentiary consequences turn upon that question. For Wong Sun's unsigned confession was not the fruit of that arrest, and was therefore properly admitted at trial. On the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, we hold that the connection between the arrest and the statement had "become so attenuated as to dissipate the taint." *Nardone* v. *United States,* 308 U. S. 338, 341. The fact that the statement was unsigned, whatever bearing this may have upon its weight and credibility, does not render it inadmissible; Wong Sun understood and adopted its substance, though he could not comprehend the English words. The petitioner has never suggested any impropriety in the interrogation itself which would require the exclusion of this statement.

We must then consider the admissibility of the narcotics surrendered by Yee. Our holding, *supra,* that this

---

hope from the way in which he gives his evidence; yet he may mistakenly entertain such a fear or hope, or he may wish by his evidence against others to gratify some spite against them."

ounce of heroin was inadmissible against Toy does not compel a like result with respect to Wong Sun. The exclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee. The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial. Cf. *Goldstein* v. *United States*, 316 U. S. 114.[18]

However, for the reasons that Wong Sun's statement was incompetent to corroborate Toy's admissions contained in Toy's own statement, any references to Wong Sun in Toy's statement were incompetent to corroborate Wong Sun's admissions. Thus, the only competent source of corroboration for Wong Sun's statement was the heroin itself. We cannot be certain, however, on this state of the record, that the trial judge may not also have considered the contents of Toy's statement as a source of corroboration. Petitioners raised as one ground of objection to the introduction of the statements the claim that each statement, "even if it were a purported admission or confession or declaration against interest of a defendant . . . would not be binding upon the other defendant." The trial judge, in allowing the statements in, apparently overruled all of petitioners' objections, including this one. Thus we presume that he considered all portions of both statements as bearing upon the guilt of both petitioners.

We intimate no view one way or the other as to whether the trial judge might have found in the narcotics alone sufficient evidence to corroborate Wong Sun's admissions

---

[18] This case is not like *Jones* v. *United States*, 362 U. S. 257, where the person challenging the seizure of evidence was lawfully on the premises at the time of the search. Nor is it like *Chapman* v. *United States*, 365 U. S. 610, where we held that a landlord could not lawfully consent to a search of his tenant's premises. See generally Edwards, Standing to Suppress Unreasonably Seized Evidence, 47 N. W. U. L. Rev. 471 (1952).

that he delivered heroin to Yee and smoked heroin at Yee's house around the date in question. But because he might, as the factfinder, have found insufficient corroboration from the narcotics alone, we cannot be sure that the scales were not tipped in favor of conviction by reliance upon the inadmissible Toy statement. This is particularly important because of the nature of the offense involved here.

Surely, under the narcotics statute, the discovery of heroin raises a presumption that someone—generally the possessor—violated the law. As to him, once possession alone is proved, the other elements of the offense—transportation and concealment with knowledge of the illegal importation of the drug—need not be separately demonstrated, much less corroborated. 21 U. S. C. § 174. Thus particular care ought to be taken in this area, when the crucial element of the accused's possession is proved solely by his own admissions, that the requisite corroboration be found among the evidence which is properly before the trier of facts. We therefore hold that petitioner Wong Sun is also entitled to a new trial.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

[For concurring opinion of MR. JUSTICE DOUGLAS, see *post,* p. 497.]

[For dissenting opinion of MR. JUSTICE CLARK, see *post,* p. 498.]

### APPENDIX TO OPINION OF THE COURT.

Statement of JAMES WAH TOY taken on June 5, 1959, concerning his knowledge of WONG SUN's narcotic trafficking

I have known WONG SUN for about 3 months. I know him as SEA DOG which is what everyone calls him.

I first met him in Marysville, California, during a Chinese holiday.   I drove him back to San Francisco on that occasion.   Sometimes he asks me to drive him home and to different places in San Francisco.

Sometime during April or May of this year, he asked me to drive him out to JOHNNY YEE's house, at 11th and Balboa Streets.   He asked me to call JOHNNY and tell him we were coming.   When we got there we went into the house and WONG SUN took a paper package out of his pocket and put it on the table.   Then both WONG SUN and JOHNNY YEE opened the package.   I don't know how much heroin was in it, but I know it was more than 10 spoons.   I asked them if I could have some for myself and they said yes.   I took a little bit and went across the room and smoked it in a cigarette.

WONG SUN and JOHNNY YEE talked for about 10 or 15 minutes, but they were talking in low tones so that I could not hear what they were saying.   I didn't see any money change hands, because I wasn't paying too much attention.   WONG SUN and I then left the house and drove.   I drove WONG SUN to his home and he gave me $15.00.   He said the money was for driving him out there.

I have driven WONG SUN out to JOHNNY YEE's house about 5 times altogether.   Each time WONG SUN gave me $10 or $15 for doing it and also, Johnny gave me a little heroin—enough to put in 3 or 4 cigarettes.   The last time I drove WONG SUN out to YEE's house was last Tuesday, May 26, 1959.   On Wednesday night June 3, 1959, at about 10:00 p. m., I called JOHNNY YEE and told him that "I'm coming out pretty soon—I don't have anything."   He said okay, so I drove out there.   When I got there I went in the house and Johnny gave me a paper of heroin.   The bindle had about enough for 5 or 6 cigarettes.   I didn't give him any money and he didn't ask for any.   He gives it to me just out of friendship.   He has given me heroin like this quite a few times.   I don't remember how many times.   I have known HOM WEI

about 2 or 3 years but I have never dealt in narcotics with him. I have known ED FONG about 1 year and I have never dealt in narcotics with him, either. I have heard people that I know in the Hop Sing Tong Club talk about HOM WEI dealing in narcotics but nothing about ED FONG. I do not know JOHN MOW LIM or BILL FONG. The only connection I have now is JOHNNY YEE.

I have carefully read the foregoing statement, which was made of my own free will, without promise of reward or immunity and not under duress. I have been given ample opportunity to make corrections have initialed or signed each page as evidence thereof and hereby state that this statement is true to the best of my knowledge and belief.

JAMES WAH TOY

JAMES WAH TOY did not wish to sign this statement at this time. He stated he may change his mind at a later date. However, I read this statement to him and in addition he read it also and stated that the contents thereof were true to the best of his knowledge. Corrections made were by JAMES WAH TOY without his initials.

/s/ WILLIAM WONG<br>William Wong, Narcotic Agent

## STATEMENT OF WONG SUN

I met JAMES TOY approximately the middle of March, this year, at Marysville, California, during a Chinese celebration. We returned to San Francisco together and we discussed the possible sale of heroin. I told JAMES that I could get a piece of heroin for $450 from a person known as BILL.

Shortly after returning to San Francisco, JAMES told me he wanted me to get a piece. I asked him who it was

for and he told me it was for JOHNNY. He gave me $450 and I obtained a piece of heroin from BILL. I did this on approximately 8 occasions, however, at least one of these times the heroin was not for JOHNNY—for another friend of JAMES TOY. JOHNNY would pay JAMES $600 for each piece.

On several occasions after I had obtained the piece for JAMES I would drive with him to JOHNNY's house, 606 11th Avenue, and we would go upstairs to the bedroom. There, all three of us would smoke some of the heroin and JAMES would give the piece to JOHNNY. I also went with JAMES on approximately 3 other occasions when he did not take any heroin and then we smoked at JOHNNY's and we would also get some for our own use.

About 4 days before I was arrested (arrested on June 4, 1959) JAMES called me at home about 7 o'clock in the evening and told me to come by. I went to the laundry and JAMES told me to get a piece. I called BILL and arranged to meet him. JAMES gave me $450 which I gave to BILL when I met him. BILL called me about one hour later at the laundry and I met him. He gave me one piece, which I gave to JAMES, and JAMES immediately thereafter called JOHNNY. We drove to 606— 11th Ave. at approximately midnight and JAMES gave the piece to JOHNNY. It was contained in a rubber contraceptive in a small brown paper bag.

Again on June 3rd, the night before I was arrested, I met JAMES at the laundry, prior to 11 o'clock in the evening, and JAMES telephoned JOHNNY at EV—6–9336. Then we went out to JOHNNY's and smoked heroin and also had one paper for our own use later. We were there approximately ½ hour and then left.

The laundry mentioned is OYE's LAUNDRY, 1733 Leavenworth Street, which is run by JAMES TOY. I do not know JOHNNY's last name and know him only

through JAMES TOY. As well as the few times at JOHNNY's home, I have seen JOHNNY on a number of occasions at the laundry.

I have carefully read the foregoing statement, consisting of 2 pages which was made of my own free will, without promise of reward or immunity and not under duress. I have been given ample opportunity to make corrections, have initialed or signed each page as evidence thereof and hereby state that this statement is true to the best of my knowledge and belief.

WONG SUN

.  .  .  .  .

WONG SUN, being unable to read English, did not sign this statement. However, I read this statement to him and he stated that the contents thereof were true to the best of his knowledge.

/s/ WILLIAM WONG
William Wong, Narcotic Agent

MR. JUSTICE DOUGLAS, concurring.

While I join the Court's opinion I do so because nothing the Court holds is inconsistent with my belief that there having been time to get a warrant, probable cause alone could not have justified the arrest of petitioner Toy without a warrant.

I adhere to the views I expressed in *Jones* v. *United States,* 362 U. S. 257, 273. What I said in the *Jones* case had been earlier stated by Mr. Justice Jackson, writing for the Court in *Johnson* v. *United States,* 333 U. S. 10 (another narcotics case):

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its pro-

tection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." Pp. 13–14. And see *Chapman* v. *United States,* 365 U. S. 610, 615–616.

The Court finds it unnecessary to reach that constitutional question. I mention it only to reiterate that the *Johnson* case represents the law and is in no way eroded by what we fail to decide today.

Mr. Justice Clark, with whom Mr. Justice Harlan, Mr. Justice Stewart and Mr. Justice White join, dissenting.

The Court has made a Chinese puzzle out of this simple case involving four participants: Hom Way, Blackie Toy, Johnny Yee and "Sea Dog" Sun. In setting aside the convictions of Toy and Sun it has dashed to pieces the heretofore recognized standards of probable cause necessary to secure an arrest warrant or to make an arrest without one. Instead of dealing with probable cause as involving "probabilities," "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Brinegar* v. *United States,* 338 U. S. 160, 175 (1949), the Court sets up rigid, mechanical standards, applying the 20–20 vision of hindsight in an area where the ambiguity and immediacy inherent in unexpected arrest are present. While probable cause must be based on more than mere suspicion, *Henry* v. *United States,* 361 U. S. 98, 104 (1959), it does

not require proof sufficient to establish guilt. *Draper* v. *United States,* 358 U. S. 307, 312 (1959). The sole requirement heretofore has been that the knowledge in the hands of the officers at the time of arrest must support a "man of reasonable caution in the belief" that the subject had committed narcotic offenses. *Carroll* v. *United States,* 267 U. S. 132, 162 (1925). That decision is faced initially not in the courtroom but at the scene of arrest where the totality of the circumstances facing the officer is weighed against his split-second decision to make the arrest. This is an everyday occurrence facing law enforcement officers, and the unrealistic, enlarged standards announced here place an unnecessarily heavy hand upon them. I therefore dissent.

## I.

The first character in this affair is Hom Way, who was arrested in possession of narcotics and told the officers early that morning that he had purchased an ounce of heroin on the previous night from Blackie Toy, who operated a laundry on Leavenworth Street. Narcotics agents, armed with this information from a person they had known for six weeks and who was under arrest for possession of narcotics, immediately sought out Blackie Toy, the second character. The laundry was located without difficulty (as far as the record shows) from the information furnished by Hom Way. The Court gratuitously reads into the record its supposition that Hom Way "merely invited the officers to roam the length of Leavenworth Street (some 30 blocks) in search of one 'Blackie Toy's' laundry . . . ." On the contrary, the identification of "Blackie" and the directions to his laundry were sufficiently accurate for the officers—two of whom were of Chinese ancestry—to find Blackie at his laundry within an hour. I cannot say in the face of this record that this was a "roaming" per-

formance up and down Leavenworth Street. To me it was efficient police work by officers familiar with San Francisco and the habits and practices of its Chinese-American inhabitants. Indeed, the information was much more explicit than that approved by this Court in *Draper* v. *United States, supra.*

There are other indicia of reliability, however. Here the informer, believed by the officers to be reliable,* was under arrest when he implicated himself in the purchase of an ounce of heroin the previous night. Since he was in possession of narcotics and his information related to a narcotics sale in which he was the buyer, the officers had good reason to rely on Hom Way's knowledge. See *Rodgers* v. *United States,* 267 F. 2d 79 (C. A. 9th Cir. 1959), and *Thomas* v. *United States,* 281 F. 2d 132 (C. A. 8th Cir.), cert. denied, 364 U. S. 904 (1960). As to his credibility, he was confronted with prosecution for possession of narcotics and well knew that any discrepancies in his story might go hard with him. Furthermore, the statement was a declaration against interest which stripped Hom Way of any explanation for his possession of narcotics and made certain the presumption of 21 U. S. C. § 174. I do not see what stronger and more reliable information one could have to establish probable cause for the arrest without warrant of Blackie Toy.

But even assuming there was no probable cause at this point, the Government produced additional evidence to support the lawfulness of Blackie's arrest. In broad daylight, about 6:30 on the same morning that Hom Way was arrested, one of the officers of Chinese ancestry, Agent Alton Wong, knocked on Blackie Toy's laundry door. When Wong told him that he wanted laundry, Blackie

---

*One of the officers testified at the trial that he had known Hom Way for six weeks. In response to the question whether Hom Way was a reliable informer, the officer replied, "I believe so, yes, sir."

opened the door and advised him to return at 8 a. m. Wong testified that he then "pulled out [his] badge" and announced that he was a narcotics agent. Blackie slammed the door in Wong's face and ran down the hall of the laundry. Wong broke through the door after him—calling again that he was "a narcotics Treasury agent." Only when Blackie reached the family bedroom was Wong able to arrest him, as he reached into a nightstand drawer, apparently looking for narcotics. Agent Wong immediately confronted him with Hom Way's accusation that Blackie Toy had sold him narcotics. Blackie denied selling narcotics, but he did not deny knowing Hom Way and later admitted knowing him. There is no basis in *Miller* v. *United States,* 357 U. S. 301 (1958), for the Court's conclusion that Blackie's flight "signified . . . a natural desire [by Toy] to repel an apparently unauthorized intrusion. . . ." As I see it this is incredible in the light of the record. Nor is there any support in the record that "before Toy fled, the officer never adequately dispelled the misimpression engendered by his own ruse." On the contrary the officer's showing of his badge and announcement that he was a narcotics agent immediately put Blackie in flight behind the slamming door. To conclude otherwise takes all prizes as a *non sequitur.* As he pursued, Wong continued to identify himself as a narcotics agent. I ask, how could he more clearly announce himself and his purpose?

This Court has often held unexplained flight—as here— from an officer to be strong evidence of guilt. *E. g., Husty* v. *United States,* 282 U. S. 694 (1931); *Brinegar* v. *United States, supra,* at p. 166, n. 7; see *Henry* v. *United States, supra,* where the Court was careful to distinguish its facts from those of "fleeing men or men acting furtively." 361 U. S., at 103. Moreover, as the Government has always emphasized, this is particularly true in narcotics cases where delay may have serious consequences, *i. e.,* the hid-

ing or destruction of the drugs. This Court noted without disapproval in *Miller* v. *United States, supra,* the state decisions holding that "justification for noncompliance [with the rule] exists in exigent circumstances, as, for example, when the officers may in good faith believe . . . that the person to be arrested is fleeing or attempting to destroy evidence. *People* v. *Maddox,* 46 Cal. 2d 301, 294 P. 2d 6." 357 U. S., at 309. And the Court continued, "It may be that, without an express announcement of purpose, the facts known to officers would justify them in being virtually certain that the petitioner already knows their purpose so that an announcement would be a useless gesture. Cf. *People* v. *Martin,* 45 Cal. 2d 755, 290 P. 2d 855; Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 798, 802 (1924)." *Id.,* at 310.

The Court places entire reliance on the decision in *Miller.* I submit that it is inapposite. That case involved interpretation of the law of the District of Columbia. *Id.,* at 306. The arrest was at night, and the door was broken in just as the defendant began to close it. Thus there was no flight but only what the officers believed to be an attempt to bar their entrance. The only identification given by the officers occurred before the defendant opened the door, when "in a low voice" through the closed door they answered the defendant's query as to who was there by saying, "Police." *Id.,* at 303. The facts in *Miller* differ significantly from this case both in the clarity of identification by the officers and in the character and extent of the defendant's conduct. For that reason, the conclusions that Blackie's flight is evidence to support probable cause and that the officers gave sufficient notice to permit lawful entry are supported rather than weakened by the Court's decision in *Miller.*

The information from Hom Way and Blackie Toy's unexplained flight cannot be viewed "in two separate, logic-tight compartments. . . . [T]ogether they composed

a picture meaningful to a trained, experienced observer." *Christensen* v. *United States,* 104 U. S. App. D. C. 35, 36, 259 F. 2d 192, 193 (1958). I submit that the officers as reasonable men properly concluded that the petitioner was the "Blackie Toy" who Hom Way informed them had committed a felony and that his immediate arrest—as he ran through his hall—was lawful and was imperative in order to prevent his escape. In view of this there is no "poisonous tree" whose fruits we must evaluate, and Blackie's declaration at the time of the arrest and the narcotics found in Yee's possession are admissible in evidence. The trial court found that evidence sufficiently corroborative of Toy's confession, and the Court of Appeals affirmed. For the same reasons discussed, *infra,* as to Wong Sun, I see no occasion to overturn these consistent findings of two courts.

## II.

As to "Sea Dog," Wong Sun, there is no disagreement that his confession and the narcotics found in Yee's possession were admissible in evidence against him. The question remains as to whether there was sufficient independent evidence to corroborate the confession. Such evidence "does not have to prove the offense beyond a reasonable doubt, or even by a preponderance . . . ." *Smith* v. *United States,* 348 U. S. 147, 156 (1954). The requirement is satisfied "if the corroboration merely fortifies the truth of the confession, without independently establishing the crime charged . . . ." *Ibid.;* see also *Opper* v. *United States,* 348 U. S. 84 (1954). Wong Sun's confession stated in part that about four days before his arrest he and Toy delivered an ounce of heroin to Yee and that on the night before his arrest—the night of June 3, 1959— he and Toy smoked some heroin at Yee's house. On June 4, 1959, the officers found at Yee's residence quantities of heroin totaling "just less than one ounce." In light

of this evidence, I am unable to say that the trial court and the Court of Appeals erred in holding that Wong Sun's confession was sufficiently corroborated.

The Court does not reach a contrary conclusion as to corroboration, but it grants Wong Sun a new trial on the ground that the trial court "may" also "have considered the contents of Toy's statement as a source of corroboration" of it. This point was not raised as a question here nor was it discussed in the briefs. Despite this the Court goes to some lengths to develop a chain of inferences in finding prejudicial error. This might be plausible where the case was tried to a jury, as were all the cases cited by the Court. Indeed, I find no case where such presumption of error was applied, as here, to a trial before a judge. The Court admits that the heroin found in Johnny Yee's possession might itself be sufficient corroboration, but it reverses on the excuse that the judge "may" have considered Toy's confession as well. I see no reason for this assumption where a federal judge is the trier of the fact, and I would therefore affirm the judgment as to both petitioners.