Allen Eugene WHITCHURCH, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–77–273.

Court of Criminal Appeals of Oklahoma.

Nov. 10, 1977.

T. E. Drummond, Drummond, Drummond, Raymond & Payne, Pawhuska, for appellant.

Larry Derryberry, Atty. Gen., Harold T. Garvin, Jr., Asst. Atty. Gen., for appellee.

OPINION

BRETT, Judge:

Appellant, Allen Eugene Whitchurch, hereinafter referred to as defendant, was charged in the District Court, Osage County, Case No. CRF–76–140, with the offense of Burglary in the Second Degree, in violation of 21 O.S.1971, § 1435, After Former Conviction of a Felony, 21 O.S.1971, § 51. The case was tried to a jury and a guilty verdict was returned. Punishment was assessed at fifteen (15) years' imprisonment. From judgment and sentence defendant has perfected an appeal to this Court.

On February 14, 1976, Dr. Sam Strohm, part owner of the Osage Animal Clinic in Pawhuska, Oklahoma, left the clinic for the day. When he returned early Sunday morning, the clinic was in shambles. Items were strewn about and numerous articles,

including drugs, a radio and a microscope, were missing. A rear door showed signs of forced entry.

Andy Surrittee, also employed at the clinic, testified that at about 6:00 p. m. on February 14 he drove by the clinic and noticed a blue GMC pickup with a white camper on it. However, he did not think anything of it at the time. At trial, both Surrittee and Dr. Strohm identified numerous articles, including drugs, a microscope and a radio, as some of the items taken from the clinic.

In proof of the charge of second degree burglary, the State showed that defendant, in the early part of February, 1976, was living with Cindy McKay, and George and Cynthia Maxey in Oklahoma City. Cindy McKay testified that one day in February defendant and George Maxey left the residence in Maxey's blue GMC pickup with a white camper on the back. She testified that when defendant left he stated that they were going to the country to get some "goodies." Several days later they returned with suitcases full of drugs and numerous other articles, including syringes, a microscope and a radio. For several days the foursome sat around "doing" the drugs. Eventually, they decided to go to the Maxey's cabin on Lake Tenkiller. They took the drugs and other articles with them, and they continued to "party" at the lake where they were eventually joined by some other young people. After about four days, on February 27, trouble developed in the form of a fight between Cindy McKay and Cynthia Maxey. At about the same time, the truck and defendant's car were driven into a ditch. A neighbor of the Maxeys, W. L. Mullins, observed the commotion and the auto accident and called the police.

Wayne Briggs, Lake Security Patrolman, received a radio transmission and went to the scene. A State Highway Patrolman, Deewitt Teehee, arrived soon after. Briggs placed all the partygoers under arrest for disturbing the peace and public drunk. When defendant was arrested, he gave the patrolman a false name. Prior to taking all the arrestees to jail, Briggs permitted some of them, including defendant, to retrieve some clothing from the cabin. At this time the defendant crawled out the bathroom window and fled. All the others were taken to jail.

Trooper Teehee testified that he called a wrecker and had the blue GMC pickup and a white Dodge impounded. Teehee stated that he performed an inventory on the vehicles, and he also stated that the GMC pickup contained, among other items, a microscope and a radio, which he identified in court.

Meanwhile, all the other suspects were searched and booked into jail. They were described as being extremely intoxicated, although no odor of alcohol was apparent. One girl had hypodermic syringes in her purse, and several others had fresh needle marks. Subsequently, on the same day as the initial arrest, a search warrant for the Maxey's cabin was obtained. The search uncovered numerous drugs, many of which bore labels indicating that they came from the Osage Animal Clinic. Subsequently, a warrant for the two vehicles was obtained, and the microscope, radio and other objects in the blue GMC pickup were seized.

On February 26, the day after the mass arrest, John Vance was showing two women a trailer house in the vicinity of the Maxey cabin. While showing the trailer he discovered defendant hiding in a closet. Vance turned over defendant to Wayne Briggs, who rearrested him, and defendant gave Briggs the same false name. Defendant was transported to the Cherokee County Courthouse, where after being advised of his rights he gave a statement. In the statement defendant stated, in reference to the numerous drugs and other articles found in the cabin, that when he, George Maxey and Cindy McKay first arrived at the cabin these articles were not present. George Maxey and Cindy McKay went back to Oklahoma City the next day and defendant remained alone at the cabin. About two days later, Maxey returned, bringing with him all of the aforementioned articles.

Later on that same day, February 26, 1976, at about 8:00 p. m., defendant was

questioned by Ralph Enlow and Boyd Peters, Osage County Deputy Sheriffs. Defendant was informed of his rights and told that the officers wished to speak to him concerning the burglary of the Osage Animal Clinic. During the course of this interview, defendant admitted he had given a false name and stated what his name actually was. The statement he gave was essentially the same as the one given earlier, except herein he stated that George Maxey had told him that he had "done a veterinary clinic in Pawhuska, Oklahoma." Further, defendant stated that sometime prior to the burglary George Maxey asked defendant if he knew of a veterinarian clinic which could be "hit." Defendant replied that he knew of one in Pawhuska that had been burglarized by some "locals" several years ago. Defendant, however, denied offering to help George Maxey burglarize the clinic.

Bill Mitchell, also an Osage County Deputy Sheriff, stated that on March 5, 1976, he visited with defendant in the Sheriff's Office, at which time defendant indicated to him that he would like to make a "deal." Defendant stated to Mitchell that he could "put" himself and Maxey in the Osage Animal Clinic on the day of the burglary, but that he would like to receive a suspended sentence in return. The offer was refused. Mitchell testified, however, that at no time did the defendant actually state that he had in fact burglarized the clinic.

In support of the after former conviction of a felony charge, the State introduced evidence that defendant had been twice convicted of felonies, once for embezzlement and once for forgery.

■ Defendant's first assignment of error is that his initial arrest was illegal, and that therefore the evidence seized was fruit of the poisonous tree, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and that it should have been suppressed upon defendant's objection to its admission into evidence. This contention is without merit. A review of the evidence reveals that defendant and the others, including George Maxey, Cynthia Maxey and Cindy McKay, were all arrested on the afternoon of February 25. All were taken to jail on that day by police, except defendant, who fled through the bathroom window and who was not apprehended until the following morning. Acting on information obtained from those who were actually brought into custody on February 25, the police secured a warrant and searched the Maxey cabin on the evening of the 25th. It is thus apparent that defendant's illegal arrest, if it was illegal, played no part in the search of the cabin or in the seizure of evidence therefrom. Defendant has no standing to object to the unlawful arrest of another, or to the seizure of evidence from one so unlawfully arrested. Further, defendant does not contend that the evidence obtained from those actually taken into custody on February 25 was insufficient to establish probable cause to search the cabin.

A review of the facts of *Wong Sun v. United States*, supra, reveals that it is almost precisely analogous to the case at bar. There, federal agents first arrested one Hom Way, who had heroin in his possession. Hom Way gave the agents the name of James Wah Toy. The agent illegally arrested Toy and obtained information from him, that one Johnny Yee was in possession of heroin. The agent arrested Yee who had heroin. Yee told the officers that he had obtained the heroin from James Toy and "Sea Dog," who was later identified as Wong Sun. Both Wong Sun and James Toy were charged with transporting and concealing illegally imported heroin. The court excluded the heroin seized from Yee, as to James Toy, but said it was admissible against Wong Sun:

> "[E]xclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee. The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial. . . ." (Citation omitted) 371 U.S. at 492, 83 S.Ct. at 419.

In the present case, defendant stands in the same position as Wong Sun. Assuming arguendo that defendant's initial arrest was illegal, because he escaped before being searched or making a statement, the issuance of the search warrant, the search of the cabin, and the seizure of the evidence sought to be suppressed was in no way the result of defendant's arrest. As there was no causal connection between defendant's supposedly illegal arrest and the seizure of the evidence, defendant has no standing to object to its introduction.

█ One other question remains to be resolved. Certain items of evidence were seized from the blue GMC pickup, including the radio and microscope. These items were seized on the afternoon of February 26, pursuant to a search warrant. Defendant was rearrested on the morning of the 26th, and at about 11:00 a. m. gave his statement to the police. This Court has not been provided with a copy of the search warrant for the truck, nor the supporting affidavit. Defendant does not contend that the police did not have probable cause to search, and we therefore do not reach this issue. However, we find that although defendant was in custody, and although his arrest may have been illegal, the search of the truck was nonetheless made with a warrant. In such case the burden of proof devolves upon the defendant to show that the search was illegal. *Davie v. State*, Okl. Cr., 414 P.2d 1000 (1966). Defendant herein has failed to show that the issuance of the warrant for the truck was in any way connected to his arrest. Rather, the evidence indicates that the issuance of the warrant for the vehicles was based upon information uncovered during the search of the cabin. This being so, then it was not error to admit it.

█ Defendant's second and final assignment of error urges that the description of the location of the Maxey cabin in the search warrant was insufficient. The description contained in the warrant, as testified to by Deputy Sheriff Rocky Camden, is as follows:

"A. . . . . A white, two room cabin, 19 miles south of Tahlequah in the Chicken Creek Village, two miles west and a quarter of a mile south of the Chicken Creek Grocery, belonging to Ruth and William Lee Maxey."

The testimony of State Highway Patrolman Teehee reveals that after the arrestees were jailed the warrant was obtained, and that he, Deputy Sheriff Rocky Camden and Assistant District Attorney Nathan Young, proceeded to the Maxey cabin. Trooper Teehee testified that since he had earlier been to the cabin he did not follow the directions in the warrant. Further, he stated that the cabin was located simply one quarter of a mile south of the Chicken Creek Grocery, and not two miles west and a quarter of a mile south thereof. Teehee testified that if one were to proceed two miles west of the grocery one would end up in Lake Tenkiller. Further testimony revealed that the Chicken Creek Grocery is located on a country road 19.7 miles south of Tahlequah and two miles west of State Highway 82.

In *Woodard v. State*, Okl.Cr., 567 P.2d 512 (1977), we had occasion to deal with an imprecise description in a search warrant, and stated as follows:

"While we agree with the defendant that the description could have been more clear, it is apparent the officers had no difficulty finding the location in that they had it under surveillance throughout the night of April 25–26. We find there was no reversible error in the description, . . . ."

Herein, the situation is analogous. Trooper Teehee investigated the accident and disturbance at the Maxey cabin prior to obtaining the warrant, and thus had no need to rely on the description of the location contained in the warrant. Further testimony reveals that the error was merely clerical. Rather than being located two miles west and one quarter mile south of the Chicken Creek Grocery, the cabin was located one quarter mile south of the Grocery, which in turn was two miles west of State Highway 82. Considering these circum-

stances, we are of the opinion that as in the *Woodard* case there is no reversible error in the description.

Defendant also contends that oral testimony taken at the time the warrant was issued was not transcribed and filed until two days after the warrant was issued, and that 22 O.S.1971, § 1224.1, requires that such testimony be transcribed and filed "forthwith," and that reversible error was therefore committed. This contention is wholly frivolous.

For the foregoing reasons the judgment and sentence is *AFFIRMED*.

BUSSEY, P. J., and CORNISH, J., concurs.