THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* TOMMY L. PERRY *et al.*, Defendants-Appellees.

First District (4th Division)   Nos. 76-853, 76-854 cons.

Opinion filed September 29, 1977.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Myra J. Brown, and Salvatore R. Marzullo, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Ronald Alwin, Assistant Public Defender, of counsel), for appellee Tommy L. Perry.

George P. Lynch, of Chicago, for appellee Sherly McKee.

Carl M. Walsh, of Chicago, for appellee Rudolph R. Martin.

Mr. PRESIDING JUSTICE DIERINGER delivered the opinion of the court:

This is an appeal by the People of the State of Illinois (hereinafter "the People") of an order by the circuit court of Cook County granting a motion to suppress evidence and quash the arrest of Tommy L. Perry, Rudolph R. Martin and Sherly McKee (hereinafter "defendants"), who were indicted and on trial for the April 5, 1974, armed robbery of Ella Johnson, theft and unlawful possession of a motor vehicle. The cases were consolidated on appeal.

The issue presented for review is whether the trial court erroneously excluded the evidence discovered by the arresting officers.

On April 5, 1974, the defendants were arrested for armed robbery, theft and unlawful possession of a motor vehicle. The defendants were arraigned and pleaded not guilty to the charges. Prior to the trial, the defendants filed motions to quash the arrest and suppress all evidence obtained, alleging the arrest was without probable cause.

At the hearing on the motions, Sherly McKee testified that on April 5, 1974, she was riding in an automobile traveling south on Michigan Avenue with Perry and Martin, when their auto was stopped by a police car. The driver of the auto, Martin, got out to "see what was wrong." Shortly thereafter, Perry got out of the car. McKee was seated in the car for approximately three minutes when a police officer approached the auto and told her to get out of the car. One of the officers searched the car while she stood on the sidewalk. The other officer searched Perry and Martin. At this time, McKee was wearing a loose fitting, long sleeve, hip length suede coat. This coat was snapped all the way down from her neck to her hips. One of the police officers unsnapped her jacket and took a gun from her, which was tucked in her pants. About seven minutes had elapsed from the time the car was stopped until McKee's jacket was opened by the officer.

Rudolph Martin, the driver of the auto, next testified for the defense and, in general, corroborated Sherly McKee's testimony.

A stipulation was then entered into that if Martin and McKee were called on behalf of Perry, on the motion to quash the arrest and suppress evidence, their testimony would be identical to the testimony they gave on their own behalf. All the defendants then rested on their motion.

Officer James Leyden testified for the People that on April 5, 1974, he was parked in an unmarked squad car on Scott Street, west of Lake Shore Drive. He saw a 1965 dark blue Oldsmobile with three occupants driving

at a high rate of speed and in a negligent manner. When the Oldsmobile passed the squad car, the officer and his partner pursued. Officer Leyden estimated the Oldsmobile was traveling at 40 miles per hour as it proceeded on Scott Street. They followed the Oldsmobile until it reached Michigan Avenue, when they used blinking lights and a hand stoplight to stop the auto. Two of the occupants of the auto got out as soon as the car stopped. The officers left their car and approached the other auto at this same time.

Officer Leyden also testified that approximately 15 minutes prior to stopping the Oldsmobile, he had received a radio message to watch for an armed robbery suspect in a dark blue, late model, General Motors car, possibly an Oldsmobile. The suspect was described as an 18-year-old male Negro, between five feet and five feet two inches tall, 100 pounds, wearing a black hat, black jacket and light colored slacks.

Officer Leyden further testified as soon as they stopped the Oldsmobile, two of the occupants got out and approached the squad car. The passenger, Perry, resembled the description Officer Leyden had received earlier of the armed robbery suspect. Officer Leyden ordered both men up against the car. He and his partner then frisked the men for weapons, and told McKee to get out of the car. She hesitated, and, as she got out of the car, the officer observed her right hand attempting to stuff a revolver into her waistband. Her coat was open at the time. When the officers saw the gun they grabbed her and took possession of the gun.

On cross-examination, Officer Leyden testified he issued no traffic citations to Perry, or Martin, and no description was given over the radio of a Negro woman or a five feet seven inch Negro man. The officer gained possession of the weapon from McKee within a minute of the stop of the car, and the gun was five or six inches long in total. Lastly, the officer admitted he could not see the clothing worn by the occupants of the Oldsmobile as it passed his squad car. Both sides rested on the motion.

The trial judge, after hearing the testimony of the witnesses, and having read the briefs in support of the motion, stated:

> "The court does not believe the officers when they stated that that automobile was being driven by Martin at a high rate of speed and leaving the impression that an automobile chase ensued. None of the facts support such statement by the officers. Had there been an automobile chase I am certain that there would have been put on the radio another flash message coming from the officer's automobile requesting assistance in an attempt to curb an automobile which was attempting to elude the police officers in the proper exercise of their duties.
>
> There has been no indication of any such flash message having been given by the officers in this case, which further strengthens

the court's belief—rather, disbelief as to the officer's testimony that the automobile was being driven at a high rate of speed, violating statutes with reference to the traffic laws both of the City of Chicago and of the State of Illinois.

The court feels that being without probable cause these officers stopped these petitioners because of the fact that they saw this not late model automobile, but certainly one that was at least eight years old in an area where black people were not usually seen at 12:45 A.M. in the morning and acted as officers usually do and will do and as good, aggressive officers should, I suppose, under the facts and circumstances of the crime rate as we know it today, thought that it would be best that they stopped these people and check them out, so to speak.

But the fact that they acted on suspicion, the fact that they turned up that it had been the commission of a crime was all after the fact. They acted without probable cause, and on the basis of the authority of *People v. Bean,* the court finds that having without probable cause and having made the stop and arrest on suspicion, the motion to suppress physical evidence would be sustained.

The court also finds that everything that transpired after the illegal stop, arrest, search and seizure is the fruit of the same poisonous tree and, therefore, should also be suppressed; and the motion to suppress any statements will be suppressed and the motion to quash the arrest will also be allowed."

On appeal, the People do not dispute the finding by the trial court the stop and arrest were illegal, but instead argue there were intervening acts (McKee getting out of the car and displaying the weapon) which purge the taint of the illegal arrest.

In *Weeks v. United States* (1914), 232 U.S. 383, 58 L. Ed. 652, the United States Supreme Court for the first time applied the "exclusionary rule" in holding the fourth amendment barred the use of evidence secured through an illegal search and seizure. Later, in *Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, the court held under the fourteenth amendment to the United States Constitution the exclusionary rule is binding upon the State courts and illegally searched and seized evidence is inadmissible in State court prosecutions just as it had been held inadmissible in Federal criminal trials.

Although the exclusionary rule is now solidly entrenched in United States jurisprudence, questions continuously arise as to when the rule must be applied, or when certain evidence should be excluded as being "fruit of the poisonous tree." The origin of the "taint" or "fruit of the poisonous tree" doctrine, as it was later called, was the court's opinion in *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 64 L. Ed.

319, 40 S. Ct. 182. There, the defendant had secured return of illegally seized documents pursuant to a court order. While in possession of these documents, however, the government had photographed them. It then used the photos to obtain a subpoena requiring the defendant to produce the originals at trial. In holding the government could not use the photos to support the subpoena, the court, speaking through Mr. Justice Holmes, pointed out:

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others * * *." *Silverthorne*, 251 U.S. 385, 392, 64 L. Ed. 319, 321, 40 S. Ct. 182.

Later, the court in *Nardone v. United States* (1939), 308 U.S. 338, 84 L. Ed. 307, 60 S. Ct. 266, although reversing criminal convictions and remanding with directions to exclude evidence, recognized and eased the limitation on the prosecutorial use of evidence applied by the court in *Silverthorne*. The court was concerned sophisticated argument would all too often prove a causal connection between information obtained and the government's proof in cases where common sense shows "such connection may have become so attenuated as to dissipate the taint." *Nardone*, 308 U.S. 338, 341, 84 L. Ed. 307, 312, 60 S. Ct. 266.

Subsequently, the court in *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, as in *Silverthorne*, recognized evidence learned pursuant to an unconstitutional search or arrest could be used against a defendant where the government learned of the evidence from an independent source. Moreover, the court in *Wong Sun*, while citing *Nardone*, recognized use of evidence against a defendant where the causal connection between the lawless conduct of the police and the discovery of the challenged evidence is remote enough so as to attenuate the taint. The court, speaking through Mr. Justice Brennan, stated:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' * * *" *Wong Sun*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 445, 83 S. Ct. 407.

In order to better understand the law stated in *Wong Sun* an examination of the facts therein is essential, as two separate factual issues regarding attenuation were presented.

Federal narcotics agents entered defendant "Blackie Toy's" house without a warrant and without probable cause placed him under arrest. One of the agents said to Toy, "[Hom Way] says he got narcotics from you." Toy responded, "No, I haven't been selling any narcotics at all. However, I do know somebody who has." When asked who that was, Toy said, "I only know him as Johnny." Johnny Yee was later arrested and turned over to the authorities a small amount of heroin, which was later used against defendant Toy. The question then became whether the heroin was to be excluded as fruit of the agent's unlawful arrest of Toy. The court held the heroin was fruit of the unlawful arrest and should be excluded as "the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' " (*Wong Sun*, 371 U.S. 471, 485, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407.) The court, in citing the Federal Courts of Appeals (*McGinnis v. United States* (1st Cir. 1955), 227 F.2d 598), noted testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies.

As to the second factual issue regarding attenuation in *Wong Sun*, the named defendant (Wong Sun) was arrested without probable cause or reasonable grounds. However, his confession was made after his release on his own recognizance, after a lawful arraignment and after his voluntary return to the authorities several days later. The court held the confession was not fruit of the arrest, finding instead the connection between the arrest and the statement had " 'become so attenuated as to dissipate the taint.' " *Wong Sun*, 371 U.S. 471, 491, 9 L. Ed. 2d 441, 457, 83 S. Ct. 407.

In determining whether certain evidence is tainted or whether it has become so attenuated as to dissipate the taint, value judgments, of course, must vary with changes in the fact situations from which they are derived. In the case at bar, the weapon found on Sherly McKee was observed during an illegal arrest. We think it clear the weapon was secured in the possession of the police by the exploitation of that illegality, and the connection between the illegal arrest and the securing of the weapon had not become so attenuated as to dissipate the taint. We hold, therefore, the defendants' motion to suppress was properly sustained.

Assuming arguendo, the People were to prevail on the legal issue of attenuation, certain factual issues would still remain.

The People assert the legal theory of attenuation based upon the testimony of a police officer who was found by the trial court not to be worthy of belief. The sole witness for the People, Officer Leyden, testified he saw the auto occupied by the defendants being driven at a high rate of speed in a negligent manner. He pursued the auto for about eight blocks before stopping it. As McKee got out of the auto the officer

noticed a gun showing from her open coat. Although the three defendants were arrested, no traffic citations were issued and no call for assistance was ever placed on the police radio.

Two defendants testified they were at all times traveling at a proper rate of speed. While being followed by the officers, just before being stopped by said officers, the defendants stopped for three stop signs and one red light. When getting out of the car at the time of arrest, McKee was wearing a loose fitting, long sleeve, hip length suede coat, which was snapped closed from her neck to her hips. One of the officers unsnapped her coat and took a gun from her, which was tucked in her pants.

Although the testimony of the witnesses is contradictory as to many of the facts, one thing is plain from the record, the court did not believe the officer's testimony as to the operation of the auto carrying the defendants. Furthermore, this determination of credibility by the trial judge is not questioned by the People on appeal.

We must take the record as it appears. Since the evidence in the record shows Officer Leyden's testimony regarding the operation of the auto carrying the defendants was not believed, and the defendants' version was believed, we cannot assume the officer's version of the arrest and confiscation of the weapon was believed in the face of contradictory testimony of the accused. Since no finding of fact was made in this regard, we can only assume, if anything, the officer's testimony as to the discovery of the gun was similarly not believed. Upon such assumption, it is without question the arrest and search of McKee was improper and the motion to suppress was properly sustained.

For the foregoing reasons the order of the circuit court of Cook County is hereby affirmed.

Affirmed.

LINN and ROMITI, JJ., concur.