595 P.2d 1026

**The STATE of Arizona, Appellant,**

v.

**Douglas Duane DeWOODY, Appellee.**

**No. 2 CA–CR 1426.**

Court of Appeals of Arizona, Division 2.

March 28, 1979.

Rehearing Denied May 2, 1979.

Reviews Denied May 22, 1979.

Stephen D. Neely, Pima County Atty. by Paul S. Banales, Deputy County Atty., Tucson, for appellant.

John M. Neis, Pima County Public Defender by Donald H. Bayles, Jr., Asst. Public Defender, Tucson, for appellee.

## OPINION

HATHAWAY, Judge.

Appellee was charged by indictment with armed robbery, A.R.S. § 13–641 and § 13–643(B), as amended, and unlawful wearing of a mask, A.R.S. § 13–981, § 13–1645 and § 13–1647, as amended. Upon appellee's motion, the superior court ordered certain evidence suppressed, finding it had been illegally procured through appellee's unlawful warrantless arrest for disturbing the peace. Rehearing was denied. The state appeals and we affirm.

At approximately 2:00 a. m. on November 29, 1977, Tucson police officers Miss Pence and Mr. Munoz responded to a call concerning a possible fight at the Jack-in-the-Box restaurant at Speedway and Venice. The restaurant manager, Gary Quinn, another employee, and appellee were the only persons inside.

Quinn informed the officers that appellee's friend had caused the disturbance and had already departed. The departed suspect had jumped over the counter, had thrown a coke at Quinn and had pushed him around. Quinn advised the police that appellee had nothing to do with the disturbance.

The officers attempted to interrogate appellee, asking for his name, for identification, and for information about what had happened. Appellee refused to respond to the officer's questions, stating that he had ordered and paid for his food, had waited 20 minutes for it, and wanted it. The state maintains that a limited field interrogation was justified pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),

contending that since appellee's "friend," who had caused the disturbance, was no longer available for questioning, it was only natural to question appellee to ascertain what had occurred.

Assuming a limited field interrogation was justified, the testimony conflicts as to appellee's manner and tone in refusing to respond to interrogation. The officers testified that appellee was loud and belligerent. Quinn, on the other hand, gave a different perspective, which the trial court apparently accepted, through the following pertinent testimony:

"A. He came with—with the other guy who jumped over the counter.

Q. Did—prior to the police arriving at the—at the Jack In The Box did Mr. DeWoody engage in any loud or unusual noise?

A. He was—no, he was just—he just stood there; was just watching his friend do it.

Q. All right. Did he engage in any tumultuous or offensive conduct?

A. No, he just—

Q. Did he threaten anybody or quarrel or challenge to fight anybody?

A. No, he didn't do any of those.

Q. Did he use any violent, abusive, or obscene language to anybody else?

A. No.

Q. All right. When the police arrived tell me generally what happened.

A. Well, they came and they asked me, you know, what was—what was the problem. And I told them some guy jumped over the counter, and, you know—and threw a soft drink at me and took off.

\* \* \* \* \* \*

They asked Mr. Woody [sic] about his friend; were asking him—said where did he go to—

\* \* \* \* \* \*

And he didn't answer them, so they asked him—asked him again. And he was asking him why should he tell him, like he was his friend. So they told him if he didn't tell them,

he would get in trouble for his friend for not telling who his friend was and where he took off to. And he still refused. And so they—finally they—he kept telling them that they have not got the right, you know, to ask these questions or search him because—then they told him to put his hands on the counter and spread his legs. And that's when he started to tell them they had no right to search him; that he didn't do anything; that he was doing nothing. He was just standing there while his friend was doing all this pushing around and stuff.

Q. All right. During the time this questioning is going on, how would you describe DeWoody's tone of voice?

A. Oh, it was—it was normal tone. It only began to rise when they like started searching him and told him—

Q. When you say it started to rise, did it get to—its hard to ask you this, but he was speaking in a normal tone of voice until they started searching him; is that right?

A. Yes.

Q. And then you say they began to search him and his voice began to rise?

A. Yes.

Q. Okay. How high did it rise?

A. Well, it was sort of like—like he was more upset that he was being searched. And he didn't do anything.

Q. All right. And during the—prior to his being searched in the presence of the officers, did he use any loud or unusual noises?

A. No. He didn't use any loud voices.

Q. Did he engage in any tumultuous or offensive conduct?

A. No he just—like just stood there. They had to force him down, you know, to search him.

Q. Did he threaten or quarrel or challenge any of the officers, or to fight him?

A. No, he didn't do any of this.

Q. Did he use any violent language towards them; obscenities?

A. No.

Q. And you stated that at the time that his voice began to rise from a normal height—from a normal tone of voice was actually at the time that they were searching him?

A. Yes.

Q. And then he was upset. And would you say—would it be fair to say that his voice at that time was loud or unusual?

A. Well, yes, it was somewhat loud.

Q. Somewhat loud?

A. Uh-huh."

According to Quinn, as appellee "just stood there," the three officers wrestled him to the floor, handcuffed and searched him, and arrested him for disturbing the peace. His city court trial resulted in acquittal.

While appellee was being transferred to jail, testimony provided by Officer Yanez disclosed that appellee repeatedly asked, "Why didn't you bust the guys that robbed the Fotomat?" These questions, apparently alluding to a robbery allegedly committed by appellee, were held admissible and are not subject to this appeal.

When booked, appellee was required to empty his pockets. A bank deposit envelope "made out . . . from the Fotomat to a local bank" was seized and turned over to Officer Yanez, who approached appellee, read him his rights, and briefly questioned him. Yanez then booked appellee on the armed robbery charge and turned the information over to the detectives. Later that morning, robbery detectives, confronted appellee in jail and received an incriminating statement from him. No testimony at the motion to suppress disclosed any further circumstances under which the incriminating statement was given.

■ Warrantless arrests for misdemeanors are restricted to those which take place in the officer's presence. *State v. Nixon,* 102 Ariz. 20, 423 P.2d 718 (1967). Probable cause justifying arrest without a warrant must be based on facts and circumstances within the officer's knowledge. Viewing the evidence most favorably to the court's ruling, *State v. Gaines,* 113 Ariz. 206, 549 P.2d 574 (1976), and deferring to the court's resolution of the conflicting testimony, *State v. Payne,* 7 Ariz.App. 43, 436 P.2d 137 (1968), we accept Quinn's testimony as accurately representing the situation surrounding appellee's arrest. It appears he was arrested without probable cause. Therefore, neither his arrest nor the subsequent search can be justified. *State v. Stauffer,* 112 Ariz. 26, 536 P.2d 1044 (1975). The evidentiary product of the initial illegality, which by itself did not produce the questioned evidence, is nevertheless inadmissible as the "fruit of the poisonous tree." E. g., *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

"Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. 371 U.S. at 485, 83 S.Ct. at 416.

\*   \*   \*   \*   \*   \*

[T]he more apt question . . . is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [citation omitted]" 371 U.S. at 488, 83 S.Ct. at 417.

■ The bank deposit envelope was properly suppressed as the direct product of appellee's illegal arrest. The court also acted correctly in suppressing appellee's statement. The materials, discovered during appellee's booking on the disturbing the peace charge and which were turned over to the robbery detectives, resulted in the jail confrontation and appellee's incriminating statement.

"The test to be applied in determining whether evidence is the 'fruit of the poisonous tree' is whether the government learned of the evidence from an independent source." *State v. Taylor,* 27 Ariz. App. 330, 334, 554 P.2d 926, 930 (1976); Accord, *State v. Lamb,* 116 Ariz. 134, 568 P.2d 1032 (1977).

No showing that the materials would have been obtained without the illegal arrest was made. The court recognized this in its minute entry of February 17, 1978:

"Defendant contends that, subsequent to the booking and search at the jail, a confession or inculpatory statement was obtained from the defendant by the police by confronting the defendant with the illegally seized items, and that such a statement or confession is also subject to suppression as the 'fruit of the poisonous tree.' The burden is upon the county attorney to show that the statement or confession was not so obtained. There having been no evidence on this point at the suppression hearing, the county attorney has failed to sustain his burden in this regard."

Rule 16.2(b), Rules of Criminal Procedure, 17 A.R.S., obliges the prosecutor to prove "by a preponderance of the evidence, the lawfulness in all respects of the acquisition of all evidence which he will use at trial." The state did not meet its burden.

The order of suppression is affirmed.

RICHMOND, C. J., and HOWARD, J., concur.