THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* SHERWIN BOSTON, Defendant-Appellee.

First District (3rd Division)    No. 78-743

Opinion filed June 6, 1979.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, James S. Veldman, and Suzanne Philbrick, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Thomas Murphy and James Rhodes, Assistant Public Defenders, of counsel), for appellee.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

The defendant, Sherwin Boston, was charged with aggravated assault, unlawful use of weapons, failure to possess an Illinois firearm owner's identification card, failure to register a firearm, and failure to carry firearms registration. His pretrial motion to suppress evidence was allowed, and the State appeals. We affirm.

The principal witness at the hearing on the motion was a Chicago police officer, who testified first for the defendant and later for the State. In his testimony, he stated: He was called to an address where shots were allegedly being fired. On arriving, he met Louis Wylie, the complainant, who was standing on the sidewalk, putting on his pants. Wylie told the officer that a man had fired four shots at him, and had then driven off—accompanied by Wylie's sister—in a black-over-green Riviera. The two men then spotted a black-over-green Riviera about a block away, not moving. Wylie told the officer, "That's the car, that's the man!" The officer drove toward the Riviera, which started moving, stopped the Riviera a

couple of blocks farther on, and stopped his own police car about 15 feet behind. There was no high-speed chase, and no traffic citations were issued for this incident or pending at the time. The officer and his partner, who did not testify at the hearing, emerged from their squad car, and approached the Riviera. The defendant meanwhile left the car and came toward the rear, stopping to lean over the front seat and apparently hide something under it. He had not in fact been driving the car, as Wylie had claimed; the defendant's companion, a young lady, was behind the wheel, and remained there throughout the following scene. The officers asked her to get out, but did not insist. The officer told the defendant he was under arrest, but never told him why. The defendant had not closed the front door of the car on the passenger side, and, looking in, the officer saw part of a gun sticking out from under the front seat, in plain view.

The defendant seeks to suppress the gun and all evidence relating to its discovery in the car. His version of the incident was different. Boston testified that when he got out of the car he did not lean over the seat or seem to put anything under it; he simply leaned against the front door. One of the officers—the defendant could not remember which one— climbed into the car and searched it for several minutes. The defendant said that the gun was not in plain view; it was only turned up by the search.

This case turns entirely upon the credibility of the witnesses. If the police officer's version of the facts is accurate, the evidence should not be suppressed. If, on the other hand, his story was fabricated, the circuit court's order is correct. The trial judge saw and heard the witnesses; and it is obvious that he believed the defendant and did not believe the police officer. Even in print, the officer's testimony appears suspect, and we can understand how the trial judge reached the conclusion he did.

## I

The officer's description of the events at the car, besides being flatly contradicted by the defendant, is inherently incredible. According to the officer, the defendant did not take advantage of his ample opportunity to hide the gun while still in the car, but instead waited until he had stepped out into the officers' view, and even then hid the gun so clumsily that half of it remained visible. He also forgot to close the car door. The police officer testified that he saw the gun from outside the car; but his official police report stated that the officers "searched" the car. At the hearing, the officer declared that the word "searched" did not mean what it seemed to. The record reflects that twice during his appearance as a witness, the officer started to respond in a way that would have undermined his position, and caught himself just in time. He began one answer, "I put my head in the —" and then changed to a less invasive way of observation.

When asked whether he or his partner had searched the car, the officer began his answer, "My partner —." He then caught himself, and gave a nonresponsive answer concerning something else his partner had done. Furthermore, the trial judge allowed the motion to suppress immediately following the officer's attempt to demonstrate the way the defendant had leaned over the car seat. We infer from the timing of the trial court's decision that the officer was spectacularly inept in this demonstration. From this evidence, the trial court might reasonably have concluded that, the officer's testimony to the contrary, he or his partner did conduct a substantial search to find the evidence in question, without having seen any furtive hiding movements by the defendant.

■■ If the evidence was the fruit of a search, it must be suppressed unless the search was justified. (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) We have already disposed of one possible justification: the claim that the officers saw the defendant trying to hide something under the seat. The only other possible theory based on the events at the scene of the arrest might be that the officers searched the car for weapons to ensure their own safety. But the officer did not express any such motive; moreover, the defendant was arrested behind the car, not in it, and the officers had so little fear of the lady behind the wheel that they not only did not arrest her, but allowed her to remain in the driver's seat while they searched. In short, once we accept the facts as the trial court apparently found them, the search was not justified by anything that occurred at the scene of the arrest.

## II

Neither can we uphold the search on the basis of what happened before the officers stopped the defendant. The officer's testimony, if believed, might seem ample grounds for a search: the defendant had just fired a gun at Wylie, so he was very likely to have it still upon him, or in the car. But the judge was not required to believe any of this. Having concluded that the officer was not truthful about what happened when he stopped the car, the court could properly decide that none of his testimony was truthful.

The defendant has the burden of proof on a motion to suppress. (Ill. Rev. Stat. 1977, ch. 38, par. 114—12(b).) The State argues that, since the officer's story about what happened before the car was stopped was uncontradicted, the defendant cannot prevail; the State's position is that even if we discount the officer's testimony, the resulting void favors the State. However, the result of disbelieving the officer is not merely a void. Presumably, the officer would fabricate only if the truth would not justify the search. His testimony therefore supports an inference that the search was unjustified. This inference is enough to support a finding for the

defendant. The lack of defense evidence on this point, on the other hand, creates no adverse inference, for it is perfectly understandable. The defendant did not hear the alleged conversation between the officer and Wylie, and so could not himself testify on this subject. It is no surprise that he did not care to call Wylie: Wylie was the complaining witness, and obviously hostile to the defendant.

■■ Moreover, the defendant's burden of proof is not as heavy as the State suggests. A defendant on a motion to suppress is trying to prove a negative, that there was no justification. He need not identify and rebut every imaginable theory; in the nature of things, it will be the State that proposes one or more justifications. Then, since the case usually turns on what police officers observed or were told, the evidence will largely be in the State's control. The defendant may sometimes be unable to produce any positive evidence at all. He is not required to do so. Once he establishes that the police had no warrant and that the defendant was doing nothing unusual at the time, the burden of going forward with the evidence to demonstrate the legal justification for the search shifts to the State. (*People v. Jackson* (1978), 57 Ill. App. 3d 720, 724, 373 N.E.2d 729.) The defendant's burden is at most to persuade the court that his position is more likely correct than not. If the State's version of the facts is improbable *a priori*, a complete lack of evidence can support a finding for the defendant.

The officer's story of what Wylie told him, and of how the officer reacted, is inherently suspect. If someone had indeed just shot at Wylie, is it likely that Wylie's sister would desert her brother and go off with the assailant? Would they then park a block away and sit in plain view while Wylie talked with the police? Of course, these things are possible; but we think the natural reaction would be for the officer to inquire a little more closely about the incident before chasing off. There was no hurry: the Riviera was parked, not escaping. The theory that the dialogue between the officer and Wylie induced the search is implausible enough that the court, observing the officer as he testified, would be entitled to believe the contrary of his testimony even in the absence of positive evidence to support that belief.

■■ As there is sufficient evidence to support the circuit court's finding, the suppression order must be affirmed.

Order affirmed.

McNAMARA and RIZZI, JJ., concur.