Charles COLBERT, Jr., Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-80-419.

Court of Criminal Appeals of Oklahoma.

Nov. 5, 1982.

Patti Palmer, Deputy Appellate Public Defender, Norman, for appellant.

Jan Eric Cartwright, Atty. Gen., Jimmy D. Givens, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BRETT, Presiding Judge:

Charles Colbert, Jr., appeals from a conviction for Manslaughter in the First Degree pursuant to 21 O.S.1981, § 711, received in Carter County District Court Case No. CRF–78–269. Following a non-jury trial, the appellant was sentenced to eight (8) years of imprisonment.

On December 2, 1978, at approximately six o'clock in the evening, Bobby Edwards observed his uncle, Carlos Daniel Hammons, and the appellant exit Hammons' car outside of Hammons' residence. Bobby Edwards talked briefly with them and noticed they were both heavily intoxicated. A short time later Chris Edwards, the son of Bobby Edwards, helped the appellant carry Hammons into his house.

On December 5, 1978, Bobby Edwards discovered the body of his uncle, Carlos Daniel Hammons, on the living room floor of Hammons' house. Mr. Hammons' body was face-up on the floor with blood around his head, apparently having been badly beaten. There was no sign of a forced

entry, but scattered bottles, cards and furniture indicated that a struggle had taken place. A knife blade was found in the victim's shirt and the body had serious lacerations and fractures. Rigor mortis was complete.

The appellant, Charles Colbert, Jr., was arrested later that evening by the Sheriff's deputies. O.S.B.I. agent, Tom Lockhart, read the appellant the *Miranda* rights. Colbert expressed that he understood these rights, but he seemed confused. Thereafter, Deputy Sheriff Atnip read through the rights form with the appellant line by line and told him that he had to understand them before they could ask him any questions. After Atnip explained each right in as simplified language as possible, he asked Colbert if he wanted to sign the form. Colbert stated he didn't know for sure. Then Deputy Atnip in an effort to ascertain how much Colbert understood, asked him if he knew why he was there. The appellant replied, "Because I killed Mr. Hammons." Deputy Atnip then inquired if he wanted to go ahead and talk and Colbert replied yes, he guessed so, he knew he was going to have to go to jail sooner or later. Again his rights were read to him one line at a time. He stated that he understood them and signed the form. Next Deputy Atnip slowly and carefully explained the rights waiver form and Colbert indicated that he knew what it meant and wanted to sign it. Colbert stated that he had killed Mr. Hammons during a struggle that ensued over an argument concerning money Mr. Hammons owed him. He told Atnip that the shoes he had been wearing and the knife handle corresponding to the blade found on the victim's body could be found at the house Colbert shared with his father. Deputy Atnip and Agent Lockhart obtained the father's consent to search the house and recovered the knife handle and shoes.

The appellant now raises for the first time on appeal the argument that the statutes governing competence to stand trial in effect at the time of his trial were unconstitutional per se on substantive and procedural due process grounds pursuant to the U.S. and Oklahoma Constitutions. These statutes, 22 O.S.1971, §§ 1171–1174, were repealed in 1980 and replaced by 22 O.S.Supp. 1980, § 1175.1 et seq. Specifically the appellant asserts that the statutes in effect during his trial were inadequate because there was no provision for a pre-trial hearing on competency and no definition or standard by which the competency could be judged.

According to the record, Colbert was committed for observation prior to trial on the application of defense counsel. Upon completing an examination of the appellant, Dr. Schmidt of the Department of Forensic Psychiatry at Central State Hospital confirmed that the appellant could differentiate between right and wrong and was mentally competent. Two other independent examinations were conducted after the preliminary hearing but before trial, and the doctors' letters, found in the record reveal that the appellant had an extremely low I.Q. but opinions conflicted as to his competence in general. The judge, at each and every appearance of the appellant cautiously and painstakenly questioned him as to whether he understood his rights and the proceedings against him.

The appellant relies primarily on the case of *Rex v. Owens,* Memorandum Opinion CIV–76–0978–E (W.D.Okl. Jan. 22, 1980) an unpublished opinion in which a federal district court ruled that §§ 1171–1174 were unconstitutional as violations of equal protection and substantive due process. However, the issue in *Rex,* supra, was the invalidity of Oklahoma's involuntary indefinite commitment procedures, whereas the instant case pertains to the validity of the competency determination procedure. The critical determination in the present case is whether the Oklahoma Statutes were adequate to protect the appellant from being tried for a crime at a time when he might have been mentally unable to consult with his lawyer and aid in his own defense.[1]

---

1. Although the statutes in question did not provide a test for competency this Court enunciated the following one in *Beck v. State,* 626 P.2d 327 at 328 (Okl.Cr.App.1981):

The statutes complained of have been considered by the Oklahoma Courts in prior cases and case law supplementation of these statutes has attempted to correct any original inadequacies. This Court found an implied right to notice and a hearing was required by these statutes before an accused could be committed for observation to a mental hospital. *In Re Lutker,* 274 P.2d 786 (Okl.Cr.App.1954). And, in *Pierce v. State of Oklahoma,* 436 F.Supp. 1026 (W.D. Okl.1977) the Court held that the Oklahoma procedures were constitutionally adequate to protect the right of an accused not to be tried while legally incompetent. Although the statutes complained of may not have provided the best means for an initial competency determination, they certainly were, as *Pierce* and *Lutker* recognized, a reasonable vehicle toward that end. We therefore find the appellant's first assignment of error is without merit.

Secondly, the appellant argues that even if the statutes pursuant to which his competence was determined were facially valid they were applied to him in an unconstitutional manner. He complains that he was denied due process of law because the competency determination was made without a "complete" competency hearing, without cross-examination of Dr. Schmidt and Dr. Meadows, and without an explicit declaration by the trial judge as to the standard of proof employed in determining competence or upon whom that burden was placed. The appellant's reliance on *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), for the proposition that a full and complete evidentiary hearing was required in Oklahoma is misplaced. The Supreme Court determined in *Pate* that the defendant was entitled to a sanity hearing because, pursuant to Illinois Revised Statutes c. 38, § 104–2 (1963), where the evidence raised a "bona fide doubt" as to a defendant's competence to stand trial, the judge on his own motion had to impanel the jury and conduct a sanity hearing.

We disagree with the appellant's contention that an evidentiary hearing was constitutionally required if a doubt as to his competency to stand trial was raised. The relevant statutes, 22 O.S.1971, §§ 1171–1174, required that the individual, upon proper application, could be committed to a state hospital for observation and examination for a period not to exceed sixty days. If, as in the present case, the doctors, after observation and examination as provided, determined that the individual was presently sane, the order of the district court suspending proceedings were to be dissolved.

The appellant had ample opportunity at the preliminary hearing and at his trial to present evidence to establish his incompetence. The trial judges were quite concerned with this issue and allowed the appellant every opportunity to assert his incompetence, including two additional examinations and extensive questioning of the appellant during each phase of the proceedings. Testimony by one of the mental experts was even heard by the judge, along with cross-examination. It is apparent from the record that the appellant's rights were adequately protected in the court below and thus no due process violation occurred.

The appellant urges in his third assignment of error that the trial court erred in allowing him to waive his trial by jury. He contends that the court's ruling regarding the waiver of his right to jury trial cannot be reconciled with the judge's ruling disallowing the entry of a guilty plea.

The right of trial by jury can only be waived if there is a clear showing that such waiver was competently, knowingly and intelligently given. *Westbrook v. Arizona,* 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966). An examination of the record reveals that a competent waiver was given by the appellant. Dr. Meadows, a psychologist from Ardmore testified that the appellant could understand and make a knowing

---

The test used to determine whether one accused is competent to stand trial, is whether the accused has sufficient ability to consult with his lawyer and has a rational as well as actual understanding of the proceedings against him.

decision on the question of whether or not a jury would try the case even though his level of intelligence was extremely low. We therefore find that the trial judge did not abuse his discretion in allowing the appellant to waive his trial by jury. *Beck v. State,* 626 P.2d 327 (Okl.Cr.App.1981).

■ The trial court's explanation for the two seemingly inconsistent rulings is both accurate and persuasive. A greater degree of intelligence is required to enter a guilty plea than to waive a jury trial because the guilty plea has greater ramifications. A guilty plea results in the deprivation of the right to trial and confrontation altogether, while waiver of a jury trial still allows the case to continue.

■ Also, the appellant was represented by competent counsel when he waived trial by jury. The right to a jury trial is admittedly a precious constitutional right, but its waiver is more often than not a question of trial strategy in which the subjective evaluations of the attorney for the defendant play an important role.

■ Next, the appellant alleges that a trial judge is legally incompetent to preside over the trial of a felony case. This argument is based on the fact that Article VII, Section 20 of the Oklahoma Constitution which provided trial judges with such power was repealed in 1967. However, in numerous cases decided by this Court since that time, we have stated that a trial judge may try a case upon a valid waiver by the appellant. *Beck v. State,* supra; *Cole v. State,* 569 P.2d 470 (Okl.Cr.App.1977); *McFarlin v. State,* 554 P.2d 56 (Okl.Cr.App. 1976); *Hayes v. State,* 541 P.2d 210 (Okl.Cr. App.1975); *Crawford v. Brown,* 536 P.2d 988 (Okl.Cr.App.1975). This is based on the U.S. Supreme Court decision *Patton v. United States,* 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930) stating that the reason a defendant may waive a trial by jury is because it is the right to jury trial, not jury trial itself, that is guaranteed by the U.S. Constitution.

In his fifth assignment of error, the appellant alleges the trial court erred in admitting his confession into evidence. He claims that he did not make a valid waiver of his *Miranda* rights because he did not have sufficient mental capacity to understand those rights. The appellant's argument is without merit for two reasons.

■ First, the trial judge was presented with sufficient evidence in order to conclude that the appellant did have an adequate understanding of his Fifth Amendment privilege. Dr. Meadows, who testified initially that the appellant could not understand his *Miranda* rights, changed his position on cross-examination and said that the appellant could have understood the warnings as phrased by the deputy. Because the record reveals sufficient support for the trial judge's decision, and we discern no abuse of discretion, the trial court's decision will not be disturbed.

■ Secondly, we need not reach the decision as to whether the appellant made a knowing, voluntary and intelligent waiver of the privilege against self-incrimination. The special procedural safeguards outlined in *Miranda* are required when a suspect in custody is subjected to interrogation. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). It was not "interrogation" when the deputy asked the appellant if he knew why he had been arrested and brought into the Sheriff's office, because the deputy could not have known such a question would elicit the response "Yes, I killed Mr. Hammons." The deputy himself testified that "At that point I was kind of confused, myself, because I didn't expect him to say anything about it." Without such custodial interrogation as discussed in *Miranda,* there can be no threats of coercion. Therefore, no violation of the appellant's privilege against self-incrimination occurred.

Lastly, the appellant asserts that the admission into evidence of items found at his home violated his Fourth and Fifth Amendment rights guaranteed by the U.S. Consti-

tution. At trial, the State introduced a knife handle and the appellant's shoes, both of which showed traces of human blood. These items were retrieved from the appellant's home pursuant to a consent to search form executed by his father. The appellant's confession was valid, therefore the contention that the products of the search were illegally obtained and should have been suppressed pursuant to *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) is without merit.

Finally, the appellant's father testified that the search was conducted with his permission and the officers who conducted the search testified that consent was voluntarily given even after they informed the father that he did not have to allow the search. We therefore hold that the State met its burden of establishing that the consent to search was valid given the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

For the above reasons stated, the appellant's conviction for Manslaughter and sentence of eight years' imprisonment is AFFIRMED.

BUSSEY and CORNISH, JJ., concur.