**Earl David BRYANT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 3-87-134-CR.**

Court of Appeals of Texas,
Austin.

June 13, 1990.

Rehearing Overruled Aug. 1, 1990.

Ian Inglis, Austin, for appellant.

Ken Anderson, Dist. Atty., Georgetown, for appellee.

Before POWERS, GAMMAGE and ABOUSSIE, JJ.

GAMMAGE, Justice.

A jury found Earl David Bryant guilty of felony murder and assessed punishment at confinement in the Texas Department of Corrections for 99 years. The trial court adjudged him guilty and sentenced him accordingly. We will affirm the judgment of the trial court.

The indictment in pertinent part, alleged that Bryant:

did then and there intentionally and knowingly commit the felony offense of Unlawful Possession of Marihuana by then and there intentionally and knowingly possessing a useable [sic] quantity of marihuana, to-wit: in an amount more than five pounds but not more than 50 pounds, and while in the course of and furtherance of the commission of said offense did then and there commit an act clearly dangerous to human life, to-wit: firing a firearm inside an occupied residence and did thereby cause the death of an individual, Kelley Christine Chilek....

Bryant brings three points of error in which he argues his written confession, the marihuana, and several photographs introduced by the State are all fruits of an unlawful search and were improperly admitted into evidence, in violation of his rights under the United States and Texas Constitutions.

The record discloses that around 2:30 a.m. on December 29, 1986, Williamson County deputy sheriff John Chandler observed a car speeding on Highway 183 in Cedar Park. Chandler was unable to overtake the car but pursued it until the driver stopped at the Round Rock Hospital. The driver, later identified as Lori Chilek, rushed inside carrying a child with a head injury. Upon being questioned, Chilek told Chandler that her daughter, Kelley Chilek, had been shot by Bryant. She explained that she and her two daughters had been in Bryant's residence when he began running through the house shooting and saying there were people outside trying to kill him.

After learning that Bryant's residence, a trailer house, was located near Leander in Williamson County, Chandler requested police units from the Leander and Cedar Park police departments be dispatched to the trailer house as backup until he and other Williamson County officers could arrive.

Leander police officer Eddie Baker arrived first on the scene and immediately heard a male voice yelling "Lori, where are you?" and "Lori, come back." The voice was coming from the woods surrounding the trailer house. When Cedar Park officers Hughes and Marcus arrived, Baker asked them to watch the trailer while he left to find who was yelling. He found Bryant in a clearing, naked and "skinned, scratched, [and] bruised up from head to foot." The temperature was freezing and Bryant was shaking badly. When Baker asked him what he was doing there, Bryant said two men were trying to kill him. Baker found no one else in the vicinity, helped Bryant up and put his coat around him, and led him to his patrol car.

Officers Hughes and Marcus met Officer Baker and Bryant at the patrol car. One of the officers handcuffed Bryant and placed him in the patrol car. They drove to the trailer house and Hughes and Marcus entered the trailer to secure it and make sure no one else was in it. They observed empty shell casings in the kitchen, living room, and bedroom and blood on the sofa bed and floor in the living room, but found no one present in the house and left approximately two minutes later. Soon thereafter, Chandler and three other Williamson County officers arrived. One of the Williamson County officers took Bryant into custody, placed him in his patrol car, and read him his rights.

The other three Williamson County officers entered the trailer without a warrant, photographing and gathering evidence. Approximately thirty-five to forty-five minutes later, the fourth officer brought Bryant inside the trailer to the living room. One of the officers gave him clothes to put on and Chandler asked him if he understood his rights as they had been read to him. He answered yes, and Chandler began questioning him. At some point during the questioning, another officer found two to four small quantities of marihuana in the master bedroom. The officers brought the bags of marihuana into the living room and placed them on the table in front of Bryant. Chandler then asked him if there was more marihuana in the house. He answered affirmatively and directed the officers to approximately one-half pound or more of marihuana hidden in a concealed compartment in the bathroom.

At that point the police told Bryant that the victim of the shooting, his girlfriend's three-year-old daughter, had died. Bryant was "very surprised, very upset, very emotional." He broke down, cried intermittently, and said, "I might as well tell you the whole story." Bryant then gave the officers the following account, which he later repeated in a written statement signed approximately eleven hours later at the sheriff's office.

According to Bryant, sometime earlier that month, he and an accomplice robbed a drug dealer named Jesus of 60 pounds of marihuana and some cash. Bryant's share was approximately 25 pounds of marihuana and $1,000 in cash. On the night of December 28th, Bryant, his ten-year-old son, Lori Chilek, and her two young daughters were spending the evening at Bryant's trailer house. After the three children had gone to sleep, Bryant received a telephone call from Jesus concerning some money Bryant owed him. Bryant left twice during the night to meet him and returned home after finally finding him and paying part of what he owed him.

Upon returning home, Chilek told Bryant that while he was gone, "she heard a big commotion ... and the dogs went crazy, which they never do." He also noticed that his dogs had not run out to the front when he arrived as they always did. He began to think that Jesus had sent some of his people to his house while he was gone. He and Chilek began to whisper while they were lying on the bed in the dark and then they heard sounds like someone running along the side of the trailer. Bryant grabbed his pistol and moved closer to the

door, telling Chilek to get on the far side of the bed and lie down. He told her that he "had to get them before they got us if it came down to it." He then tried to call the police, but heard someone at the back door and saw a man. As soon as he heard the doorknob turn, Bryant began firing his pistol. Through the window of the door he saw a man lying on the ground, but moving. Bryant then ran toward the front of the trailer because the front door had no lock and the children were there. He fired a few rounds at the front, then ran out the back door, hoping he would draw the intruders away from the trailer. He ran through the woods barefooted and in his underwear, running through tree limbs and barbed wire fences, thinking he was going to be shot any minute, until he could run no more. It was then that Baker found him.

It was not until this point, apparently in reaction to hearing of the victim's death, that Bryant mentioned the existence of the large quantity of marihuana. He then told the officers that the bale of marihuana he had stolen from Jesus was hidden inside a lamp table in the living room. The officers seized the bale along with other evidence during this warrantless search. At approximately 5:00 a.m., one of the officers took Bryant to the sheriff's office. Two of the officers remained for an undetermined amount of time, securing evidence. Around 12:00 noon at the sheriff's office, Bryant signed a written confession and a consent to search his residence. An officer returned and searched the trailer under the authority of the signed consent, but apparently seized no additional evidence.

Bryant filed pretrial motions to suppress his oral and written statements, photographs taken by the officers, and all evidence seized from his residence during and after his arrest. A hearing was held, and the State called officer Baker and deputy sheriff Chandler and introduced Bryant's written statement and consent to search the residence. The trial court ruled that the initial entry into the residence by officers Hughes and Marcus for the purpose of securing the premises and determining whether any perpetrators or other victims were present was lawful, that the officers

could testify to anything they observed in open view during this initial search, and that any photographs depicting what they saw in open view was admissible. The court further ruled that Bryant's statements were voluntarily given and were, therefore, admissible. The court found the subsequent entry and search by the Williamson County officers, however, to be unlawful and the marihuana seized as a result of the search, including the marihuana found at Bryant's direction, inadmissible.

But the next day, prior to commencement of trial on the merits, the court reopened the hearing on the motion to suppress. After receiving additional testimony and argument, the trial court ruled that the large bale of marihuana was seized pursuant to Bryant's oral statement and not pursuant to a search and was, therefore, admissible.

■ Bryant argues in his first point of error that the bale of marihuana is a fruit of an unlawful search and was erroneously admitted into evidence in violation of his rights under the United States and Texas Constitutions. U.S. Const. amend. IV; Tex. Const. Ann. art. I, § 9. The Court of Criminal Appeals has held that article 1, section 9 of the Texas Constitution is to be construed in harmony with the United States Supreme Court's opinions interpreting the fourth amendment. *Brown v. State*, 657 S.W.2d 797, 799 (Tex.Cr.App. 1983). A search conducted without a warrant issued upon probable cause is *per se* unreasonable under the fourth and fourteenth amendments of the United States Constitution, subject only to a few specifically established and well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Juarez v. State*, 758 S.W.2d 772, 775 (Tex.Cr.App.1988). The five basic exceptions are (1) consent, (2) incident to a lawful arrest, (3) with probable cause to search but with exigent circumstances, (4) in hot pursuit, and (5) stop and frisk. *Kolb v. State*, 532 S.W.2d 87, 89 n. 1 (Tex.Cr. App.1976).

Because none of the exceptions apply here, the trial court correctly determined that the warrantless search conducted by the four Williamson County officers was unlawful. The State does not argue to the contrary; it argues only that the bale of marihuana was found, not as a result of the search, but as a result of Bryant's confession and statement regarding its location.

Bryant argues that the confession and the bale of marihuana found as a result of the confession should have been suppressed under the fruit of the poisonous tree doctrine. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Smith v. State*, 542 S.W.2d 420, 422 (Tex.Cr.App.1976).

In *Wong Sun*, federal narcotics agents entered a laundry-residence, chased the accused into his bedroom where they arrested him, and searched the premises. In response to one of the agents' interrogations, the accused made a statement revealing the location of narcotics implicating him which were later found. The entry, arrest, and search were all held to be unlawful. The Supreme Court further found the statement and the narcotics found as a result of the statement inadmissible as fruit of the poisonous tree. The Court stated that not all such evidence is

> 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'

*Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417 (citations omitted).

The Government in *Wong Sun* argued that the accused's statements were admissible because they resulted from "an intervening independent act of a free will." The Court, however, found this contention unreasonable under the circumstances of the case in which six or seven agents had broken open the door, chased the accused to his bedroom where his wife and child were sleeping, and almost immediately handcuffed and arrested him.

The present case differs from *Wong Sun* in that Bryant was lawfully arrested. At the time of arrest, one of the officers advised Bryant of his rights. Before initiating questioning, deputy sheriff Chandler asked him again if he understood his rights as read to him and he answered, "Yes." Chandler then asked him, "Well, are you willing to tell me what went on?" Bryant again answered, "Yes," and began telling about the events leading up to the shooting, but initially omitting any mention of the marihuana. Simultaneously, the other officers were conducting an illegal search. Our inquiry is whether that illegal search tainted Bryant's statement regarding the bale of marihuana and its location.

Bryant argues that when police officers confront a suspect with evidence illegally seized in an attempt to induce a confession, a resulting confession is inadmissible as fruit of the illegal search, citing *Pitts v. State*, 614 S.W.2d 142 (Tex.Cr.App. [Panel Op.] 1981), *Barber v. State*, 611 S.W.2d 67 (Tex.Cr.App. [Panel Op.] 1981), and *Smith v. State*, 542 S.W.2d 420 (Tex.Cr.App.1976). In the cited cases, an illegal search resulted in the seizure of physical evidence, marihuana in one case and stolen property in the other two. When confronted with the evidence, the defendants confessed to the ownership of the marihuana in *Smith*, to the theft in *Pitts*, and, presumably, to the theft in *Barber* (although the opinion does not so state).

Similarly, in the present case, the officers found, during the illegal search, two to four small quantities of marihuana in the master bedroom. When the officers confronted Bryant with this marihuana and asked him if there was more, he said yes and directed them to approximately one-half pound or more of marihuana hidden in a concealed compartment in the bathroom. These amounts of marihuana, however, do not constitute the marihuana which is the subject matter of the underlying felony possession charge in the indictment, nor

that which Bryant argues on appeal should have been suppressed.

The bale of marihuana, State's exhibit 4, weighing 22 pounds, 4 ounces, according to the State's expert witness, is the subject of our analysis. This marihuana was not found by the police during an illegal search and then identified by Bryant as belonging to him as in the above-cited cases. Nor did Bryant tell the officers about it upon being confronted with other marihuana they had found during the illegal search, thus arguably falling within that class of evidence "come at by exploitation of that illegality." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417.

Instead, when confronted with the other illegally-seized two to four small quantities of marihuana, Bryant told the officers about another small amount and told them a story differing from his ultimate confession regarding the large bale. Bryant made that confession or statement only after he was later told of the victim's death. At trial, Chandler testified about when Bryant told him about the bale:

#### Redirect Examination

. . . . .

Q: Now, with respect to the Defendant, what he said to you there at the trailer house, did he immediately tell you about where to find State's Exhibit 4?

A: No, sir, he did not.

. . . . .

Q: Did he tell you something else at first?

A: Yes, sir.

Q: What got him around to ... telling you about State's Exhibit 4?

A: When he was informed that the little girl had died.

Q: Did you inform him of that?

A: Yes, sir, I did.

Q: Only after that is when he told you where State's Exhibit 4 was?

A: Yes, sir.

. . . . .

#### Recross Examination

Q: ... Him [sic] being informed of the death of the little girl was like an emotional trigger that started this confession to you? Is that what I understand?

A: I think the statement when we told him the little girl had died, I think at that time Mr. Bryant decided to tell us the truth.

Q: All right. Now, but with reference to this State's Exhibit No. 4 that we're talking about, he didn't just come out and tell you about it? He told you that when he was confronted with some other marijuana that the officers had found and he was asked by you if there was any more and where it was, is that correct?

A: He did not tell us where that bale was, about the other marijuana. He told us about the other marijuana that we found in these hidden places, but he did not tell us about the bale of marijuana until such time he was confronted with the death of the little girl.

Q: All right. But you had also confronted him with other marijuana that your officers had found on their own, is that correct?

A: Yes sir.

Q: And you confronted him with that marijuana?

A: Yes, sir.

Q: You said, "Okay, David, tell me if there's any more. Where is it?"

A: Yes, sir.

. . . . .

#### Further Redirect Examination

Q: But that statement is not what led him to tell you where State's 4 was. That's when he told you the falsehood?

A: Yes, sir.

Q: Then, only after you confronted him with the fact that Kelley had died did he get around to telling you about State's Exhibit 4?

A: Did he finally tell us the truth about what's in his statement or tell us what's in his statement.

This evidence indicates that Bryant's statement regarding his possession and the location of the bale resulted from learning of the victim's death during an interroga-

tion—after he had been lawfully arrested, advised of his rights, questioned a second time about whether he understood those rights (to which he answered yes), and asked if he would tell the officers about what had happened (to which he also answered yes). Although an illegal search was conducted simultaneously with the interrogation, the evidence indicates that Bryant's statement in question did not result from "exploitation of that illegality ... [but] instead [from] means sufficiently distinguishable to be purged of the primary taint [the apprisal of the victim's death]." *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417. Because we find Bryant's statement untainted by the illegal search, it follows that the marihuana seized as the product of that statement is also untainted. Point of error one is overruled.

■ In point of error two, Bryant argues that his written confession is a fruit of an unlawful search and was erroneously admitted into evidence in violation of his constitutional rights under U.S. Const. amend. IV and Tex. Const. Ann. art. I, § 9. Bryant wrote and signed this confession in the sheriff's office approximately eleven hours after making his oral confession to the officers in his home. Chandler testified that Bryant's oral confession was "basically what's in his [written] confession." No evidence was offered to distinguish the content of the two confessions. Having already concluded that the oral confession is not a fruit of the illegal search, we further conclude that no taint of that illegality extends to the written confession.

■ Bryant, moreover, abandoned that claim at trial. When the State offered a portion of the written statement into evidence, Bryant's counsel responded, "Your Honor, we have no objection, but we would ask for the introduction of the bracketed portions as well." When an accused affirmatively asserts during trial that he has no objection to the introduction of the complained-of evidence, he waives any error in the admission of the evidence. *Dean v. State,* 749 S.W.2d 80, 83 (Tex.Cr.App.1988). Point of error two is overruled.

■ In point of error three, Bryant argues that State's exhibits 12–16, five photographs of the interior of the trailer, are fruit of an unlawful search and were erroneously admitted into evidence in violation of his rights under U.S. Const. amend. IV and Tex. Const. Ann. art. I, § 9.

■ If a verbal description of the subject matter of a photograph is admissible, the photograph is also admissible. *Huffman v. State,* 746 S.W.2d 212, 223 (Tex.Cr.App. 1988). Officer Hughes testified that, during the initial lawful search, he and officer Marcus entered the trailer through the front door and checked the south bedroom, kitchen area, living room area, and north bedroom. He further testified that he observed several spent rounds on the kitchen, living room, bedroom, and north bedroom floors as well as blood on the sofa bed and living room floor. Upon being shown State's exhibits 12–16, he testified that the photographs fairly and accurately represented the scene as it appeared to him at the time of the search. He further identified the subject matter of the photographs as being the living room, a bloodstain in the living room that he observed during the initial search, the area from the kitchen to the north bedroom, and the sofa bed in the living room.

Bryant argues in his brief that the photographs "were qualitatively different from the officers' description of the interior of Appellant's residence." He fails, however, to state how the photographs differ from the testimony and makes no reference to the record. From our study of the record, we find no distinction between the scenes depicted in the photographs and officer Hughes' testimony of those scenes. Point of error three is overruled.

The judgment of the trial court is affirmed.