645 So.2d 1023 (1994)
Andre Eugene SALEM, Appellant,
v.
STATE of Florida, Appellee.
No. 93-03207.
District Court of Appeal of Florida, Second District.
October 21, 1994.
Rehearing Denied November 29, 1994.
*1024 John Mika, P.A., Sarasota, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Susan D. Dunlevy, Asst. Atty. Gen., Tampa, for appellee.
LAZZARA, Judge.
Appellant challenges his convictions after jury trial for robbery with a firearm, two counts of kidnapping with a firearm, and carrying a concealed firearm. We agree with his contention that the trial court erred in denying his motion to suppress tangible evidence and statements obtained as a direct result of his illegal stop and detention. Accordingly, because this evidence was critical in securing appellant's convictions, we must reverse and remand for a new trial with directions that the trial court grant the motion to suppress.[1]
Detective Potter of the Sarasota Police Department was the state's only witness at the hearing on the motion to suppress. He testified that on February 25, 1993, at 10:14 p.m., he was involved in an undercover robbery surveillance of the Burger King restaurant located in the 1500 block of South Highway 41 in Sarasota. At that time, he received a radio dispatch of a robbery at the Dairy Queen restaurant in the 500 block of South Highway 301, which was approximately one mile from his location. The suspect in that robbery was described as a black male, five feet ten inches tall, medium build, wearing a blue sweatshirt, and armed with a semi-automatic handgun. It was not known if the suspect fled the scene in a car or on foot, and the dispatch did not indicate the suspect's flight path.
At approximately 10:40 p.m., while still surveilling the Burger King, Detective Potter *1025 observed a car travelling eastbound on Floyd Street heading towards Highway 41. The driver, later determined to be appellant, pulled into a closed medical office parking lot near the Burger King, parked in an assigned parking space, turned off the headlights, and turned on the dome light. He then looked down into his lap and began doing something with his hands. The detective, however, never observed the appellant look in the direction of the Burger King.
After ten to fifteen seconds, the appellant turned off the dome light, turned on the headlights, pulled out of the parking lot, and drove into the parking lot of another closed medical office just east of the previous one. He again turned off the headlights, turned on the dome light, began moving his hands around in his lap, and, after another ten to twenty seconds, left the parking lot, proceeding westbound on Floyd Street.
All that Detective Potter could observe of the appellant was that he was a black male. He could not see into the car to determine appellant's clothing, nor his height and weight. Nevertheless, the detective thought appellant may have been involved in the Dairy Queen robbery because of the proximity in time and location of that robbery to his observations of the appellant, as well as appellant's activities in the parking lots. He was also concerned that appellant may have been planning to rob the Burger King. Thus, after appellant left the second parking lot, the detective decided to follow him and initiate a traffic stop.
Detective Potter, who was in an unmarked car, then followed appellant several blocks while he radioed for marked police units to make the stop. At no time did he observe any violation of the traffic laws. Appellant was ultimately stopped at Orange Avenue and Main Street, at which time Detective Potter observed appellant "doing something" under the driver's seat of the car. Several uniformed officers with guns drawn ordered appellant out of the car and told him to place his hands on the trunk. Appellant was asked what he was doing under the front seat and answered "check it out." One of the uniformed officers responded "are you asking me to look under the seat?" Appellant again stated "check it out." The officer then looked under the seat and found a semi-automatic handgun.
At that point, appellant was arrested for carrying a concealed firearm. As an incident to this arrest, a further search of appellant's car and person immediately ensued, resulting in the discovery of a blue sweatshirt in the car and Two Hundred and Eighty Dollars on appellant's person. Additionally, at the scene and later at the police station, appellant volunteered contradictory statements as to how he obtained the money. The weapon, the sweatshirt, the money, and the statements were later introduced as evidence at the appellant's trial and were instrumental in linking him to the crimes charged.
It is well-settled that to justify an investigatory stop and detention of an individual, a police officer must have a well-founded articulable suspicion that the individual has committed, is committing, or is about to commit a crime. Popple v. State, 626 So.2d 185 (Fla. 1993); § 901.151 Fla. Stat. (1991). Mere or bare suspicion is not enough. Blair v. State, 563 So.2d 824 (Fla. 2d DCA 1990). Moreover, this court recently emphasized that "[a] report of criminal activity in the area will not justify a stop absent circumstances which create a reasonable suspicion that the person being stopped has participated or will participate in the criminal activity." Smith v. State, 637 So.2d 343, 344 (Fla. 2d DCA 1994) (emphasis added).
As noted, the radio dispatch provided Detective Potter with a description of the suspect's race, sex, height, weight, and clothing. He was only able to verify, however, that appellant was a black male. This fact, coupled with the detective's observations of appellant's behavior, did not create a founded reasonable suspicion that appellant had robbed the Dairy Queen.
Although it is possible to view appellant's behavior in a suspicious light, his actions are also suggestive of innocent conduct such as checking his wallet, reading directions, searching his pockets for an item, or doing something equally innocuous. See Estep v. State, 597 So.2d 870 (Fla. 2d DCA 1992). Moreover, Detective Potter did not articulate *1026 what he thought appellant was doing in the parking lots, except to say that he "felt something was up." While he did state that he suspected appellant was going to rob the Burger King next door, such a suspicion should have been dissipated when appellant never looked in the direction of that restaurant and then drove away from it.
The state contends that regardless of the legality of the stop, the search was legal because appellant expressly and voluntarily consented to it. A consent to search obtained after illegal police activity, however, is presumptively tainted and rendered involuntary and "will be held voluntary only if there is clear and convincing proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of prior illegal police action." Norman v. State, 379 So.2d 643, 647 (Fla. 1980). In this case, we conclude that there was no such unequivocal break between the stop and the consent. Satterfield v. State, 609 So.2d 157 (Fla. 2d DCA 1992); Reed v. State, 577 So.2d 1362 (Fla. 2d DCA 1991).
Furthermore, where there has been illegal police activity, the state must prove by clear and convincing evidence that an individual's consent was freely and voluntarily given and was not merely a submission or acquiescence to official authority. Reynolds v. State, 592 So.2d 1082 (Fla. 1992). The court in Reynolds further noted that where a suspect is placed in the inherently coercive situation of being handcuffed, the state's burden will be particularly difficult.
Here, the appellant was bent over the trunk of his car by officers who, with their guns drawn, demanded to know what appellant had been doing under the seat of the car. Given this "inherently coercive" situation, we conclude that appellant's response to "check it out" did not constitute a free and voluntary consent to search his car. Instead, it was nothing more than a "tacit approval" which, without more, was insufficient to "break the chain" of illegal activity. Cowart v. State, 635 So.2d 1063, 1064 (Fla. 2d DCA 1994). It follows, therefore, that the evidence seized from the appellant's car and person, as well as the statements he made, immediately following his illegal detention, were illegally derived by exploitation of that initial police misconduct, without any dissipation of the primary taint, and should have been suppressed as the "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
We, therefore, conclude that the trial court erred in failing to grant appellant's motion to suppress. Accordingly, we are compelled to reverse his convictions and remand for a new trial with directions that the motion be granted.
Reversed and remanded for new trial with directions.
FRANK, C.J., and PARKER, J., concur.
NOTES
[1] In view of our disposition, we need not address the trial-related issues raised by appellant.