OPINION
Defendant-appellant Alonzo Freeman appeals from his conviction and sentence on two counts of Felonious Assault, with firearm specifications. Freeman argues that the trial court erred by denying his motion to suppress evidence, which he contends was obtained as the result of an unlawful search of the residence wherein he was found at the time of the shooting. Freeman contends that the trial court erred by finding that the police officers were acting within the scope of consent given them by a resident of the premises to enter therein. We find it unnecessary to determine: (1) whether a resident of the premises gave the police officers consent to enter; (2) whether that consent was freely given; or (3) whether the police officers, upon entering the premises, remained within the scope of that consent. From the testimony at the suppression hearing, it is clear that no evidence incriminating Freeman of any offense was obtained until he began shooting at the police officers. We conclude that all of the evidence obtained thereafter was obtained, not as the product of any unlawful actions by the police officers, but as the product of the independent, unlawful act of Freeman in shooting the police officers. Accordingly, any error in the trial court's disposition of Freeman's motion to suppress is harmless, and the judgment of the trial court is Affirmed.
 I
In its decision overruling Freeman's motion to suppress, the trial court summarized the facts as follows:
 On July 7, 1999, Officers August and Jackson were on bicycle patrol in Arlington Courts, a Dayton Metropolitan Housing Authority ("DMHA") property. The Officers engaged in discussion with two juveniles in the area. After the discussion, Officer August saw an individual he knew as Chris Nesby riding on a bicycle toward their location. It was determined that Mr. Nesby was on the DMHA trespass list. Officer August informed Mr. Nesby he was under arrest, and Mr. Nesby fled on foot through the Arlington Courts complex. Both Officers August and Jackson pursued Mr. Nesby to 352 Chicahominy, the home of Deborah Nesby.
 According to the testimony, Officer Jackson went to the back of the residence while Officer August stayed in the front. Officers Robinson and Krauskopf arrived at the back of the residence and Officer Jackson then went to the front. Officers Gift and Tobias had joined Officer August in the front of the home. The testimony reveals that Officer Gift was explaining to Ms. Nesby what was taking place.
 The testimony further reveals that Officer Jackson went to the window and advised Ms. Nesby that he was in charge of the DMHA task force. Officer Jackson testified that he told Ms. Nesby that they either needed to come in or Mr. Nesby needed to come out so that he could be arrested. Officer Jackson told Ms. Nesby that if she did not comply, she could be evicted from DMHA property. The testimony shows that Ms. Nesby understood the possible DMHA consequences. After further conversation, Ms. Nesby stated, "let me get my babies out of here all right." Ms. Nesby then opened the door and took the children out of the apartment, allowing the Officers to enter. Officer Jackson asked if there were any guns in the home, and Ms. Nesby indicated "that she did not know what they had." The Officers proceeded into the house to arrest Mr. Nesby. Subsequently, Officer Jackson escorted Mr. Nesby out of the house.
 Deputy United States Marshall William Taylor testified that Officers August and Robinson went upstairs to talk to the Defendant, Alonzo Freeman, who was in the apartment and had been yelling out at the Officers. Mr. Freeman is the son of Ms. Nesby. The testimony shows that none of the Officers had previously spoken with the Defendant. The testimony indicates that Officer August pushed against the upstairs door and it appeared that the door was being held. According to Officer Taylor, when the door finally opened, the person inside the room began firing a weapon at the Officers.
In the ensuing gun battle, two officers and Freeman were wounded. The evidence in the record reflects that the casualties were removed from the scene, and the apartment was secured by the police. Later that same evening, a search warrant was obtained, and a search of the premises was conducted pursuant to the search warrant. Freeman was arrested and charged with two counts of Attempted Murder, each with a firearm specification. He moved to suppress evidence, contending that it was obtained as the result of an unlawful entry into the apartment. Following a hearing on the motion, the trial court made the findings of fact quoted above, concluded that the entry of the police officers into the apartment was with the consent of Deborah Nesby, a resident, and overruled the motion to suppress.
Following a jury trial, Freeman was found not guilty on each count of Attempted Murder, but guilty of the lesser-included offense of Felonious Assault on each of the counts, together with a firearm specification on each count. A judgment of conviction was entered, and Freeman was sentenced accordingly. From his conviction and sentence, Freeman appeals.
 II
Freeman's assignments of error are as follows:
 THE JUDGE ERRED IN NOT GRANTING THE DEFENDANT'S MOTION TO SUPPRESS WHEN SHE DETERMINED THAT THERE WAS CONSENT TO ENTER THE RESIDENCE OF DEBORAH NESBY. THE JUDGE ERRED IN NOT GRANTING THE DEFENDANT'S MOTION TO SUPPRESS WHEN SHE FAILED TO PROPERLY APPLY THE LAW OF HOT PURSUIT.
 THE JUDGE ERRED IN NOT GRANTING THE DEFENDANT'S MOTION TO SUPPRESS WHEN SHE FAILED TO FIND THAT THE CIRCUMSTANCES GIVING RISE TO THE CHARGES BELOW WERE THE RESULT OF AN UNCONSTITUTIONAL AND UNREASONABLE SEARCH INCIDENT TO ARREST.
Essentially, Freeman argues that the trial court erred when it denied his motion to suppress. Freeman argues that Deborah Nesby did not consent to the entry by the officers, that if she did consent, her consent was not voluntary, but the result of coercion, and that once the officers had entered and arrested Chris Nesby, they acted outside the scope of any consent by going upstairs to look for Freeman.
There is evidence in the record to support the trial court's finding that Deborah Nesby consented to the officers entering her apartment, although it appears that the scope of that consent may have been limited to their announced purpose of arresting Chris Nesby. Whether Deborah Nesby's consent to the entry was voluntary, or whether it was coerced, depends upon the proper construction to be given to officer Jackson's having told her that if she did not comply, she could be evicted from her DMHA apartment. The issues of the scope of Deborah Nesby's consent, and whether that consent was voluntary, are interesting issues, but we do not need to address them.
In State v. Kelly (September 24, 1993), Clark App. No. 3007, unreported, we held as follows:
 The exclusionary rule is a judicially created remedy applied to exclude evidence from the government's case in chief when it has been obtained by police through an illegal search or seizure in violation of the Fourth Amendment. Mapp v. Ohio (1961), 367 U.S. 643. The exclusionary rule applies not only to primary evidence directly obtained by police during an illegal search or seizure but also to "derivative evidence," that is, evidence discovered from knowledge gained by the police as a result of the illegal search or seizure. Silverthorne Lumber Co. v. U.S. (1920), 251 U.S. 385.
 Derivative evidence is known as "fruit of the poisonous tree." Nardone v. U.S. (1939), 308 U.S. 338.
 In order for derivative evidence to be suppressed, the evidence must have been obtained by exploitation of the illegal search or seizure, and therefore be tainted by it. Wong Sun v. U.S. (1963), 371 U.S. 471. In applying the exclusionary rule courts do not utilize a "but for" test, which would include any evidence that would not have come to light but for the search performed by the police.
 Wong Sun, supra; U.S. v. Leon (1984), 468 U.S. 897. Instead, the evidence must be the product of the illegality concerned.
 Thomas Kelly's reaction to his illegal seizure by Officer King was to engage in conduct which constituted criminal offenses wholly separate and apart from the offense Officer King was acting to investigate.
 Generally, courts have refused to extend the exclusionary rule to such evidence of distinct criminal conduct. See, 4 LaFave, Search and Seizure (1987), 458-461, Section 11.4(j). Application of the exclusionary rule is generally restricted to those areas where its remedial objectives are most efficaciously served. See, U.S. v. Leon, supra. It does not serve those objectives, which are to discourage illegal searches and seizures by police, when evidence of criminal misconduct that occurs separate and apart from the illegal police conduct is suppressed.
 In this case the evidence suppressed, to the extent that it included evidence of Kelly's offenses of Disorderly Conduct and Resisting Arrest, was not the product of Officer King's illegal actions in seizing Kelly. Neither was such evidence discovered by any exploitation of that illegality. Kelly's assaultive behavior was also not an inevitable result of Officer King's attempt to make an investigatory stop or a brief detention of Kelly for questioning. Rather, Kelly's conduct constitutes independent volitional acts which in themselves constitute criminal behavior.
 To exclude the evidence of Kelly's separate, independent and distinct criminal conduct would do little to further the purpose of the exclusionary rule in deterring unlawful police conduct, and would sanction the use of assaultive behavior in response to an illegal arrest or seizure. Such a result is patently unacceptable inasmuch as a citizen, in the absence of excessive force, is not privileged to use force in order to repel an arrest by a police officer, even an illegal one. Columbus v. Fraley (1975), 41 Ohio St.2d 173. One caveat; if the police officer intentionally provokes the illegal conduct on the part of the citizen, then a different result may obtain.
City of Dayton v. Joy (July 2, 1990), Montgomery App. Nos. 11846, 11847, unreported and State v. Scimeni (June 2, 1995), Clark App. No. 94-CA-58, unreported, are in accord. We see no reason to depart from our holdings in those cases.
Freeman's act of opening fire on the police officers constituted separate, independent, and distinct criminal conduct, having nothing to do with the purpose for which the police officers were on the premises, whether their presence was lawful or unlawful. Furthermore, there is nothing in the facts found by the trial court to suggest that any of the police officers did anything that was intended to have provoked, or that could reasonably be deemed to have provoked, Freeman into shooting at them. Consequently, we conclude that the observations of the police officers, and any evidence obtained as a result of the subsequent search warrant, were not the fruit of their having entered into the apartment — assuming that their entry was unlawful — but were the product of Freeman's independent volitional act of firing upon the police officers. Therefore, any error by the trial court in having concluded that the entry of the police officers into the premises was with the consent of Deborah Nesby, a resident, is harmless, since no evidence was obtained as the product of the police officers' allegedly unlawful conduct in entering the premises.
Freeman's assignments of error are overruled.
 III
All of Freeman's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and WALTERS, JJ., concur.
(Honorable Sumner E. Walters, of the Court of Appeals, Third Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).